# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DARRIN MCGHEE,

       *Petitioner*,

v.

ANTHONY J. ANNUCCI, acting New York State Department of Corrections and Community Supervision Commissioner, and SHARLISA WALKER, Deputy Warden of Robert N. Davoren Complex,

       *Respondents*.

Case No. _____

**PETITION FOR WRIT OF HABEAS CORPUS**

*Oral argument requested*

## <u>MEMORANDUM IN SUPPORT OF DARRIN MCGHEE'S PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254</u>

## <u>TABLE OF CONTENTS</u>

**Page**

Table of Authorities ............................................................................................................. iii

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ......................................................................................................................2

    A.    Individual-A's Statement and the People's Failure to Disclose ............................2

    B.    The Pretrial Identifications and Related Hearings ...................................5

    C.    The Trial ........................................................................................8

    D.    The Summation and Deliberations .........................................................11

    E.    Discovery of the *Brady* Violation ........................................................12

    F.    CPL § 440 Motion ................................................................................14

PROCEDURAL POSTURE ...................................................................................................18

    A.    Venue and Jurisdiction ...........................................................................18

    B.    Exhaustion and Timeliness ....................................................................18

STANDARD OF REVIEW .....................................................................................................22

ARGUMENT ..........................................................................................................................23

I.    THE COURT OF APPEALS' DECISION FINDING THAT THE SUPPRESSED WITNESS STATEMENT WAS NOT MATERIAL CONTRAVENED AND UNREASONABLY APPLIED CLEARLY ESTABLISHED SUPREME COURT PRECEDENT AND VIOLATED *BRADY V. MARYLAND* ...............................................23

    A.    The Suppressed Eyewitness Statement was Not Disclosed and was Favorable to the Defense .......................................................................25

    B.    The People's Failure to Disclose Individual-A's Statement was Material and Prejudicial ......................................................................................25

        1.    Individual-A's statement would have impeached Davis's testimony ........26

        2.    Individual-A's statement would have led McGhee to investigate new leads .......................................................................................32

        3.    Individual-A's statement would have called the police's

investigation into question .......................................................................33

II.    THE COURT OF APPEALS' UPHOLDING OF MCGHEE'S CONVICTION IN
LIGHT OF THE ERRONEOUS EVIDENTIARY RULINGS WAS AN
UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED
SUPREME COURT PRECEDENT ..........................................................35

A.    The Pretrial Identifications of McGhee Were Improperly Suggestive .................36

1.    Davis did not initially describe the shooter.................................37

2.    The initial identification was improperly suggestive................................38

3.    There is no independent basis to trust Davis's identification of
McGhee...............................................................................40

4.    The suggestive identification was far from harmless ...............................41

B.    The Witness's Hearsay Was Improperly Admitted ...............................41

III.   CUMULATIVELY, THESE ERRORS REQUIRE THAT THE PETITION BE
GRANTED .....................................................................................43

CONCLUSION........................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Banks v. Reynolds*,
  54 F.3d 1508 (10th Cir. 1995) ...............................................................32

*Boyette v. Lefevre*,
  246 F.3d 76 (2d Cir. 2001)...........................................................24, 32

*Brady v. Maryland*,
  373 U.S. 83 (1963)............................................................... *passim*

*Brisco v. Ercole*,
  565 F.3d 80 (2d Cir. 2009)...............................................................37

*Brown v. Keane*,
  355 F.3d 82 (2d Cir. 2004) .........................................................42, 43

*Cannon v. Montanye*,
  486 F.2d 263 (2d Cir. 1973), *cert denied*, 416 U.S. 962, 94 S. Ct. 1982 (1974)....................39

*Clemmons v. Delo*,
  124 F.3d 944 (8th Cir. 1997) ...............................................................32

*Collins v. Scully*,
  878 F. Supp. 452 (E.D.N.Y.1995) ...............................................................44

*Cook v. N.Y. State Div. of Parole*,
  321 F.3d 274 (2d Cir. 2003).....................................................................18

*Cotto v. Herbert*,
  331 F.3d 217 (2d Cir. 2003)...............................................................22

*Crivens v. Roth*,
  172 F.3d 991 (7th Cir. 1999) ...............................................................29

*Daye v. Att'y Gen. of N.Y.*,
  696 F.2d 186 (2d Cir. 1982) (en banc)............................................................18, 20

*Del. v. Van Arsdall*,
  475 U.S. 673, 106 S. Ct. 1431 (1986).....................................................................41

*Dennis v. Sec'y, Pa. Dep't of Corr.*,
  834 F.3d 263 (3d Cir. 2016)...........................................................26, 30, 32, 34

*Floyd v. State*,
    902 So. 2d 775 (Fla. 2005)..................................................................................33

*Francis S. v. Stone*,
    221 F.3d 100 (2d Cir. 2000)...............................................................................23

*Fuentes v. Griffin*,
    829 F.3d 233 (2d Cir. 2016)...............................................................................22

*Galdamez v. Keane*,
    394 F.3d 68 (2d Cir. 2005).................................................................................20

*Giglio v. United States*,
    405 U.S. 150 (1972).....................................................................................24, 25

*Hansen v. Smith*,
    No. 9:04-CV-574 (GLS), 2008 WL 3925637 (N.D.N.Y. Aug. 20, 2008)............43

*Jarrett v. Headley*,
    802 F.2d 34 (2d Cir. 1986).................................................................................39

*Jones v. Keane*,
    329 F.3d 290 (2d Cir. 2003)...............................................................................19

*Jordan v. Bailey*,
    985 F. Supp. 2d 431 (S.D.N.Y. 2013), *aff'd*, 570 F. App'x 42 (2d Cir. 2014).......................18

*Joyner v. Miller*,
    01 Civ. 2157(WHP)(DF), 2002 WL 1023141 (S.D.N.Y. Jan. 7, 2002) ..................44

*Juniper v. Zook*,
    876 F.3d 551 (4th Cir. 2017) .............................................................................32

*Kotteakos v. United States*,
    328 U.S. 750, 66 S. Ct. 1239 (1946)..................................................................41

*Kyles v. Whitley*,
    514 U.S. 419 (1995)................................................................... *passim*

*Leka v. Portuondo*,
    257 F.3d 89 (2d Cir. 2001).................................................................................29

*Lewis v. Conn. Comm'r of Corr.*,
    790 F.3d 109 (2d Cir. 2015).........................................................................24, 29

*Lockyer v. Andrade*,
    538 U.S. 63 (2003).............................................................................................23

iv

*Lurie v. Wittner*,
  228 F.3d 113 (2d Cir. 2000)................................................................................21

*Manson v. Brathwaite*,
  432 U.S. 98, 97 S. Ct. 2243 (1977)..............................................................36, 37

*Matteo v. Superintendent*, *Sci Albion*,
  171 F.3d 877 (3d Cir. 1999)..............................................................................23

*United States. ex rel. Meers v. Wilkins*,
  326 F.2d 135 (2d Cir. 1964)..............................................................................27

*Mendez v. Artuz*,
  303 F.3d 411 (2d Cir. 2002)..........................................................................32, 34

*Monroe v. Angelone*,
  323 F.3d 286 (4th Cir. 2003) ............................................................................29

*Mungo v. Duncan*,
  393 F.3d 327 (2d Cir. 2004)..............................................................................43

*Nappi v. Yelich*,
  793 F.3d 246 (2d Cir. 2015)..............................................................................41

*Nnodimele v. Derienzo*,
  No. 13-CV-3461, 2016 WL 337751 (E.D.N.Y. Jan. 27, 2016) ....................27, 29

*People v. Breland*,
  292 A.D.2d 460 (2d Dept. 2002) ......................................................................43

*People v. Brown*,
  80 N.Y.2d 729, 610 N.E.2d 369 (1993)............................................................42

*People v. Cotto*,
  92 N.Y.2d 68, 699 N.E.2d 394 (1998)..............................................................43

*People v. Davis*,
  115 A.D.3d 1167, 982 N.Y.S.2d 230 (4th Dep't 2014), *leave to appeal denied*,
  23 N.Y.3d 1019, 992 N.Y.S.2d 802, 16 N.E.3d 1282 (2014)...........................39

*People v. Edwards*,
  47 N.Y.2d 493, 392 N.E.2d 1229 (1979)..........................................................42

*People v. Gambale*,
  150 A.D.3d 1667, 54 N.Y.S.3d 800 (4th Dep't 2017)........................................39

*People v. Maher*,
  89 N.Y.2d 456 (1997)........................................................................................43

v

*People v. McGhee*,
    180 A.D.3d 26 (1st Dep't 2019), *rev'd,* 36 N.Y.3d 1063 (2021) ................................... *passim*

*People v. Vilardi*,
    76 N.Y.2d 67 (1990) ..........................................................................................................35

*Perry v. New Hampshire*,
    132 S. Ct. 716 (2012) ..................................................................................................36, 39

*Pfaff v. U.S.*,
    989 F. Supp. 2d 301 (S.D.N.Y. 2013)..............................................................................24

*Raheem v. Kelly*,
    257 F.3d 122 (2d Cir. 2001).................................................................................36, 37, 40

*Ramos v. Walker*,
    88 F. Supp. 2d 233 (S.D.N.Y. 2000).................................................................................20

*Rosario v. Kuhlman*,
    839 F.2d 918 (2d Cir. 1988).............................................................................................35

*Sanders v. Sullivan*,
    701 F. Supp. 1008 (S.D.N.Y.1988)..............................................................................43, 44

*United States ex rel. Scranton v. New York*,
    532 F.2d 292 (2d Cir. 1976)..............................................................................................18

*Sellan v. Kuhlman*,
    261 F.3d 303 (2d Cir. 2001)..............................................................................................22

*Simmons v. United States*,
    390 U.S. 377, 88 S. Ct. 967 (1968)...................................................................................36

*Slutzker v. Johnson*,
    393 F.3d 373 (3d Cir. 2004)..............................................................................................26

*Smith v. Cain*,
    565 U.S. 73, 132 S. Ct. 627 (2012)..............................................................................25, 39

*Smith v. Sec'y of N.M. Dep't. of Corr.*,
    50 F.3d 801 (10th Cir. 1995) ............................................................................................34

*Spicer v. Roxbury Corr. Inst.*,
    194 F.3d 547 (4th Cir. 1999) ............................................................................................29

*Strickler v. Greene*,
    527 U.S. 263 (1999)...........................................................................................................24

*Taylor v. Curry*,
    708 F.2d 886 (2d Cir. 1983)..................................................................35

*Turner v. United States*,
    137 S. Ct. 1885 (2017)........................................................................25

*United States v. Agurs*,
    427 U.S. 97, 96 S. Ct. 2392 (1976)......................................................35

*United States v. Alfonso–Perez*,
    535 F.2d 1362 (2d Cir. 1976)...............................................................44

*United States v. Archibald*,
    734 F.2d 938 (2d Cir.1984).................................................................40

*United States v. Bagley*,
    473 U.S. 667 (1985)............................................................................25

*United States v. Coppa (In re United States)*,
    267 F.3d 132 (2d Cir. 2001)................................................................24

*United States v. Curry*,
    57 F.3d 1071, 1995 WL 331471 (6th Cir. June 2, 1995)........................33

*United States v. Dizon*,
    511 F. App'x 48 (2d Cir. 2013) ...........................................................31

*United States v. Gil*,
    297 F.3d 93 (2d Cir. 2002)............................................................29, 33

*United States v. Gleason*,
    616 F.2d 2 (2d Cir. 1979)....................................................................31

*United States v. Hunter*,
    32 F. 4th 22 (2d Cir. 2022) .................................................................25

*United States v. Maldonado-Rivera*,
    922 F.2d 934 (2d Cir. 1990)...........................................................36, 37

*United States v. Orena*,
    145 F.3d 551 (2d Cir. 1998)................................................................26

*United States v. Payne*,
    63 F.3d 1200 (2d Cir. 1995).................................................................27

*United States v. Wade*,
    388 U.S. 218, 87 S.Ct. 1926 (1967).....................................................39

*United States v. Washington*,
    294 F. Supp. 2d 246 (D. Conn. 2003) ....................................................29

*Wearry v. Cain*,
    577 U.S. 385, 136 S. Ct. 1002 (2016) ...............................................25, 26

*White v. Illinois*,
    502 U.S 346, 112 S. Ct. 736 (1992) .......................................................42

*Williams v. Ryan*,
    623 F.3d 1258 (9th Cir. 2010) ...............................................................32

*Williams v Taylor*,
    529 U.S. 362 (2000) ...............................................................................22

**Statutes**

28 U.S.C. § 1331 .........................................................................................18

28 U.S.C. § 2241 ...................................................................................18, 22

28 U.S.C. § 2254(b)(1) .........................................................................18, 21

28 U.S.C. § 2254(d)(1) ...........................................................21, 22, 23, 24

All Writs Act, 28 U.S.C. § 1651 ................................................................18

Declaratory Judgment Act, 28 U.S.C. § 2201 ..........................................18

Fed. R. Evid. 803(2) ...................................................................................42

New York Criminal Procedure Law § 440 ........................................ passim

New York Criminal Procedure Law § 460 .........................14, 15, 17, 19

U.S. Const. art. 1, § 9, cl. 2 ........................................................................18

## PRELIMINARY STATEMENT

This habeas petition concerns the wrongful conviction of Darrin McGhee in New York Supreme Court for the shooting death of a victim at the Polo Grounds housing complex on November 14, 2011.  McGhee was deprived of his constitutional right to a fair trial for two critical reasons, both of which merit granting the Petition.  *First*, the District Attorney's Office for New York County ("DANY" or "the People") failed to disclose the existence of an eyewitness ("Individual-A") who offered a description of the assailant that differed in several material respects from the description of McGhee offered by the People's *sole* eyewitness who testified at trial, Nicole Davis.  The existence and identity of Individual-A was not disclosed to McGhee until **eight months after** his trial concluded.  Had McGhee or his counsel been made aware of Individual-A prior to trial, he would have had the opportunity to interview him, investigate information provided by him that exculpated McGhee, and consider having him testify at trial.  But McGhee was deprived of that right and is now serving a sentence of 25 years to life imprisonment in the Robert N. Davoren Complex.

The failure to disclose the existence of the eyewitness was a textbook violation of the People's disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).  Indeed, the failure to disclose the eyewitness was so egregious that the First Department of the Supreme Court, Appellate Division, found in favor of McGhee, stating that "[the] witness statement [] could have aided the defense in attempting to impeach the only eyewitness to the shooting in question and [] could have opened up an additional avenue of investigation," (A. 318)[1],  and remanded the case to the New York Supreme Court for a new trial.

---

[1] The Appendix containing the post-conviction materials and transcripts of McGhee's hearing and trial is cited in parentheses as "A."

*Second*, while the failure to disclose the existence of the eyewitness is enough on its own to warrant a grant of the Petition, McGhee's constitutional right to a fair trial was further undermined by the New York Supreme Court's erroneous decision to admit Davis's tainted pre-trial identifications of McGhee. Davis's first identification of McGhee was tainted when a New York City Police Department detective told Davis prior to reviewing surveillance footage to watch for "anyone matching the description of all brown," referencing the same color clothing worn by McGhee on the day of the incident. When McGhee appeared on the video wearing brown clothing, Davis stated, "That's him. That's him. He shot the boy in the Polo Ground." Davis was subsequently asked to identify McGhee in a photo array and lineup, but by that point, the damage was done: all of Davis's subsequent pre-trial identifications of McGhee were tainted by the Detective's initial suggestion to watch for "anyone matching the description of all brown." The admission of those improper pre-trial identifications by the alleged eyewitness further deprived McGhee of a fundamentally fair trial.

Standing alone, either of these defects serve as an independent basis for the Court to grant McGhee's Petition. Taken together, the cumulative effect of these errors clearly requires granting this Petition for a writ of habeas corpus. For these reasons, and those that follow, McGhee respectfully asks that the writ should issue.

## **BACKGROUND**

### A.    Individual-A's Statement and the People's Failure to Disclose

On December 30, 2011, Darrin McGhee was charged with murder in the second degree and criminal possession of a weapon in the second degree in connection with the November 14, 2011 shooting death of Archie Phillips in the parking lot of the Polo Grounds public housing complex in Manhattan. On February 1, 2013, an NYPD officer took a statement from

2

Individual-A, an eyewitness to the shooting, which was memorialized in a police report (the

"Police Report") as follows:

> On this day [Individual-A] was sitting 155th st by the train station with [redacted] and [redacted] both who are originally from the Polo Grounds. When he's hanging out, he's very observant of his surrounding area. During this time he observes a m/b wearing a beige bucket hat, darker beige shirt and khakis walking down the 110 steps. The m/b walks through the 3rd lane of the parking lot to the F/O building #3 and engages in a conversation, with a m/b (later known as Archie Phillips). At this time, he hears 1 gun shot and sees Archie being chased by the m/b (dressed in beige) running towards building #2. He loses sight of them, when they run behind the benches and then sees them again. Once he sees them again, he hears 3 more shots and sees the perp, run back towards the 110 stairs by cutting through the 1st lane of the parking lot and run's [sic] up the 110 stairs.
>
> The word on the street is that Archie "robs" people after they cash their [Social Security] check.  The killer is the son of one of his robbery victims.
>
> ADA Hammer, ADA Gilbert and ADA Krupnick did interview the ███████ in regards to the above statement.
>
> Det. Morban of the 32sqd was notified of the above statement.
>
> All perps in this case have been arrested and have a court appearance in part 71 on 3/04/13

(A. 73) (redaction in original).

The police report memorializing the statement noted that three Assistant District

Attorneys ("ADAs"), including ADA David Hammer, the lead prosecutor, jointly

interviewed Individual-A, and also that lead Detective Jorge Morban was "notified" of

the eyewitness's statement.  (A. 73).

This Police Report was not disclosed to McGhee until more than eight months

*after* he was convicted following a six-day jury trial on April 24, 2015.  McGhee and his

trial counsel requested multiple times before and after trial that the People disclose all

exculpatory witness statements in its possession, as the People are required to do, but the

People did not disclose this report (the "Police Report")—or even notify McGhee or his

counsel of the existence of Individual-A—until January 2016, more than eight months after his trial.  (A. 39, 79–86, 100).

For instance, on February 28, 2012, years before trial, McGhee's counsel made a *Brady* request for information that "might prove favorable," including information regarding "misidentification."  (A. 84–85).  Then on April 25, 2013, the trial court signed a subpoena ordering the police to disclose to McGhee "any record of the description of the alleged perpetrator" in this case.  (A. 100).  About three months later, the NYPD responded with a "certification" purporting to enclose "complete copies of record(s) in the custody of the New York City Police Department" in this case.  (A. 102).  Attached to the certification were dozens of reports documenting the police's investigation into the shooting.  The Police Report, however, was not among them. Then, on or about February 13, 2014, defense counsel prepared a motion to compel discovery seeking "immediate[]" disclosure of certain witnesses, including eyewitnesses, which would aid in his defense of misidentification.  (A. 105–06).  In that motion, more than a year before trial, McGhee's trial counsel explained: "It is critically necessary to the defendant that these witnesses be interviewed by the defense as soon as possible due to the passage of time and the difficulty involved in locating witnesses who have changed their addresses."  (A. 106).  On November 14, 2014, McGhee's counsel requested that the People release "the names [and] phone numbers" of witnesses in the case.  (A. 110).  On April 25, 2015, shortly before trial, the People represented that they would disclose information about witnesses McGhee may want to call during trial.  (A. 94–95).  Yet the People did not disclose the statement or the identity of Individual A prior to the trial.

4

Months after trial and after McGhee had already been sentenced, on November 2, 2015, McGhee submitted a FOIL request to the NYPD seeking "unredacted copies of all documents related to his criminal investigation and conviction." (A. 121–27). The People refused to respond to McGhee's request. (A. 129–30). Nevertheless, on January 4, 2016, ADA Hammer sent a letter to McGhee's trial counsel, informing them—*for the first time*—that he and other ADAs personally interviewed an eyewitness to the shooting (Individual-A) and enclosing the Police Report that was prepared "in connection with [his] interview" with the eyewitness. (A. 132–33).

B.    The Pretrial Identifications and Related Hearings

In charging McGhee with the murder of Phillips, and in proving its case at trial, the People relied heavily on the testimony of Nicole Davis, and Davis's pretrial identifications of McGhee. Davis first discussed the event with the police on November 14, 2011, the day of the shooting. At the time, the NYPD officer who spoke with her described her as "very vague in describing who the shooter was." (A. 1171). But the day after the shooting, Davis picked McGhee out of a surveillance video and a photo array and, several weeks later, picked him out of a lineup. McGhee moved to suppress the identifications as unduly suggestive and otherwise tainted and the court held a *Wade* hearing on October 22, 2014.

Detective Jorge Morban, the only witness at the hearing, testified about Davis's identification of McGhee. (A. 446). Davis was called to the police station the day after the shooting, at which time Detective Morban showed her a video of surveillance footage of St. Nicholas Avenue near the Polo Grounds. (A. 425–26, 430–32). The video depicted various people in the vicinity of the Polo Grounds around the time of the shooting, but it did not show the shooting itself. (*Id.*). The footage shows McGhee wearing brown clothing, on the street with

5

Mike Lilly, shortly after the shooting. (A. 441, 2048). In the course of the hearing, the court

pressed Detective Morban about what he said to Davis before she watched the video, to which

Detective Morban testified that he instructed her to look for "anyone matching the description of

all brown," since the police were aware from 911 calls that the perpetrator had been dressed in

brown:

> THE COURT: I'm just a little unclear about one thing. When you
> showed the witness the video I wrote a note to myself that you said
> to her initially, "if you see anyone or anything in the video regarding
> the homicide let me know." When you showed her the video what
> did you instruct her to do? Look at it for what?
>
> THE WITNESS: I told her to look at the video, see if you, basically
> anything that comes to—when I instructed her look at the video this
> in regards if you see anyone just let me know.
>
> THE COURT: Just anyone? I'm just trying to figure out what you
> had to focus on.
>
> THE WITNESS: Well. We knew it was someone in all brown, your
> Honor.
>
> THE COURT: But what did you say to her? I don't care what you
> knew. What did you tell her?
>
> THE WITNESS: We told her if you see anyone matching the
> description of all brown just let us know.

(A. 434–35). Minutes after Detective Morban gave that prompt, McGhee appeared on video and

Davis identified him, stating: "[T]hat's him, that's him. He shot the boy in the Polo Ground."

(A. 427, 438, 440).

That same day, Detective Morban showed Davis a six-person photo array. (A. 389–91).

He asked Davis if she recognized anyone, and Davis identified a photo of McGhee as the

shooter. (*Id.*). Then, on December 30, 2011, Davis viewed a six-person line-up. (A. 391, 397,

403–04). Detective Morban asked Davis if she recognized anyone "from the photo array" or

6

"[f]rom the shooting."  (A. 391–92).  After that prompt, Davis again identified McGhee.  (A. 391–92).

Davis did not know McGhee, but she claimed to have seem him twice before.  (A. 406–07).  Only after she picked out McGhee on the surveillance footage did she tell the detective, for the first time, that she had seen him two or three months prior to the shooting in the Polo Grounds, and then again a week or two before the shooting coming in and out of a building in the Polo Grounds.  (A. 406–07, 422–23, 427–28).  Despite this recollection, she did not identify him as the shooter—or immediately inform the police that she had seen the shooter on previous occasions—until after she reviewed the video footage and received the prompt from Detective Morban.  (A. 427–28).

Trial counsel challenged the "whole identification procedure" as tainted by Detective Morban's highly suggestive statement and Davis's resultant identification on the surveillance video.  (A. 442).  The trial court acknowledged that it was "a little concerned" about the video (A. 446), but ultimately held that "[t]here was absolutely no suggestion that [Davis] *should* pick out" McGhee on the video.  (A. 447) (emphasis added).  The court denied the suppression motion and the identifications were introduced during trial.  (A. 448, 1058–60).

The People also moved to introduce Davis's statement at the time of the video identification ("that's him, that's him . . .") under the excited utterance exception to the hearsay rule.  On April 28, 2015, the court held another hearing at which Detective Morban testified that he was not present when Davis made the excited utterance; he heard it when she "yell[ed]" it from another room.  (A. 1060).  Another detective was present with Davis at the identification, and Detective Morban did not know if this other detective asked Davis questions or otherwise prompted the statement.  (A. 1060, 1063–65).  The detective present with Davis at the time of the

statement did not testify and the excited utterance was introduced as evidence during McGhee's trial.  (A. 1058–60).

C.    The Trial

On April 24, 2015, a jury trial began in New York Supreme Court against McGhee as well as a co-defendant, Michael Lilly, who ran a drug-dealing business in the neighborhood, and who the People argued hired McGhee to shoot Phillips.  (A. 892–94).  Over the course of a six-day trial, the People only called one eyewitness to the shooting: Nicole Davis.  Davis testified that she lived in the Polo Grounds, and that a few minutes after 3:30 p.m. on the day of the shooting, she walked out of her building to meet friends near the parking lot next to a staircase (commonly referred to as the "110 stairs").  (A. 969, 971–92).  Davis testified that she saw the shooter "[c]om[e] inside the parking lot" and "down the aisle where [the victim] Archie Phillips was leaning" against a gate.  (A. 971–73).  Davis saw Phillips standing 50 to 60 feet away, talking to and hugging a woman.  (A. 971, 986–87).  Roughly one minute later, Davis testified that she saw McGhee, wearing "all beige" clothing, a jacket, and a "flat cap" with a "snap in front," walk up to Phillips, shoot him "right in the back four times," and then walk "out of the parking lot going out the stairs."  (A. 973–75).

While Davis first testified, as noted above, that she saw the shooter "[c]om[e] inside the parking lot" and "down the aisle where Archie Phillips was leaning" against a gate, she later testified that she did not see the shooter until he was "probably a foot" away from Phillips and did not know what direction he came from.  (A. 971–72, 983).  Moreover, Davis initially said she was not close enough to see the gun; then she said she did see the gun; then she said what she actually "saw" was the gun's "sound effects."  (A. 1042, 1048, 1053–54).

8

Davis also testified that prior to the shooting, she recalled seeing McGhee in the Polo Grounds on two occasions. (A. 975–77). The first time was "between June and July" of 2011 (*i.e.*, approximately four months prior to the shooting) in the same parking lot, where she watched him for around an hour. (A. 975, 1011). She testified that McGhee caught her attention because he was a "new face" that she had never seen before, despite living in the Polo Grounds for eleven years, and it was "fair to say [she] got to know a loft [sic] of people in the Polo Grounds." (A. 976–77). The second time she claimed to have seen him was one week before the shooting, at which time she testified that as she was exiting her building and as he was approaching, she "held the door" and they exchanged "hello[s]." (A. 977, 1016). She testified that she recognized McGhee's "physique," although she claimed that he had lost a "bit of weight" since she had seen him previously—which was, according to Davis, a few weeks prior. (A. 1036, 1043).

The People also called Detective Morban, who testified that Davis was the only eyewitness to the shooting he spoke with:

> PEOPLE: Detective, besides Nicole Davis, do you recall speaking to any other witnesses that actually viewed the shooting itself on November 14, 2011?
>
> DET. MORBAN: No.

(A. 1147–48). Consistent with the court's pretrial hearsay ruling, Detective Morban further testified that Davis said, "That's him. That's him. He is the one that shot the boy," when she saw the video. (A. 1059).

The People also called John Reynolds, who testified pursuant to a cooperation agreement. Reynolds is a career felon and domestic abuser who sold drugs as part of Lilly's drug operation. (A. 1618–21; *see generally* A. 1609–1702). Reynolds testified that the victim, Archie Phillips,

had robbed him and others working for Lilly, and that McGhee was hired by Lilly to shoot

Phillips. (A. 1619–20, 1628–38).  Reynolds did not see the shooting and admitted he was

smoking marijuana "[e]xcessively" during the entire relevant period and had no "clear memory

of details."  (A. 1637, 1686).  The People also called Reynolds's wife, Corine Tuitt, a fly on the

wall to her husband's alleged interactions with McGhee before the shooting.  (A. 1221–1321).

Tuitt testified that she did not see McGhee with a gun and did not see him the day of the

shooting.  (A. 1242–43, 1264).   Finally, the People introduced video surveillance and phone

records showing that McGhee was in the Polo Grounds area at the time of the shooting and was

friends with Lilly.  (*See, e.g.*, A. 1713–1715, 1741–1742, 1785–1786).

The People also called Dr. Christopher Borck as a forensic expert witness.  (A. 1554–95).

Dr. Borck testified that Phillips had wounds from four bullets.  Wound A entered on the left side

of the chest, (A. 1572, 1575), Wound B and Wound C, entered through the back (A. 1577, 1580–

81), and Wound D entered through Phillip' left upper arm. (A. 1582–83).

McGhee elected to testify in his defense at trial.  (A. 1727–1819).  He admitted he was at

the Polo Grounds on the day of the shooting because he "met a young lady" who lived at the

Polo Grounds, and who he visited "four or five" times.  (A. 1731–32).  He testified, however,

that he did not shoot Archie Phillips.  He acknowledged speaking with Michael Lilly because

they had been friends for over a decade and he saw him regularly (A. 1729), but he testified that

he "absolutely" did not want to get involved in Lilly's drug-selling operation and did not get

involved, (A. 1730–31), and that Lilly never asked him to "kill someone for him," (A. 1738).  He

testified that he heard "John Reynolds said he had been robbed when he was doing his business

for Mike Lilly," but that Lilly never contacted McGhee "concerning what had happen[ed] to

John Reynolds." (A. 1738). McGhee also testified that he had only been to Reynolds' residence once to help him move, and that Reynolds never gave him a weapon. (A. 1739–40).

McGhee did not dispute that he was on video surveillance near the Polo Grounds, which depicts him wearing generic khaki attire. (A. 1742–43). He testified: "I got out of the cab and walked towards the curb. I heard bang, bang, bang, bang, bang. I hid in between two cars because I don't want to get hit by stray bullets. So when the . . . bullets stopped firing, I see people running past me." (A. 1742). When the shooting stopped, McGhee decided to leave the area "because I'm [on] parole and I know that the police are going to be canvassing the area." (A. 1743). He testified that he "c[a]me up the stairs" and "s[aw] Lilly in [the] middle of [the] street" hailing a taxi. (A. 1743). McGhee told Lilly he was headed downtown, but promised to meet him later. (A. 1743). He also testified that he visited Lilly at his home later that night. (A. 1743–44).

The defense called two additional witnesses who were in the area. Germania Rodriguez saw a man she believed was the shooter in an elevator at the Polo Grounds several months after McGhee had been taken into custody. (A. 1854–59). But she eventually conceded she did not actually see the shooting itself or get a close look at the shooter's face. (A. 1860–67). A second witness for the defense, Jessica Santiago, also lived at the Polo Grounds and was present in the area of the shooting on that day. (A. 1906). Santiago provided an account that differed from Davis's (she saw a man in "dark colored clothes" she thought might be the shooter "run" from the scene and "leap[] over two sets of fences"), but she conceded she had memory issues due to a seizure condition and that her recollection was "[n]ot completely clear." (A. 1907, 1911, 1919).

D.     The Summation and Deliberations

11

ADA Hammer repeatedly emphasized the importance of Davis's testimony in summation. He told the jury that it had heard from only "[o]ne witness"—Nicole Davis—"that actually observed the shooting and could see the shooter." (A. 2002). He added that Davis's "testimony *alone* proves the defendant is guilty beyond a reasonable doubt," and later added that "we could have sat down after we called Davis." (A. 2002, 2014) (emphasis added). The prosecutor also stressed the importance of Davis's out-of-court identifications, noting that she identified McGhee not once but "four different times." (A. 2004).

The jury was instructed on second-degree murder and second-degree weapon possession. During deliberations, the jury requested, *inter alia*, to re-review the testimony of Germania Rodriguez, the defense eyewitness who was present at the Polo Grounds and thought she saw the shooter in an elevator while McGhee was in custody. (A. 2107–08). On July 7, 2015, McGhee was convicted of murder in the second degree (NYPL § 125.21(1)) and criminal possession of a weapon in the second degree (NYPL § 265.03(3)), and sentenced to an aggregate term of 25 years to life imprisonment. (A. 2126, 2135).

E.     Discovery of the *Brady* Violation

In April 2013, long before the trial and at the defense's request, the court ordered the police to disclose "any record of the description of the alleged perpetrator." (A. 100). At the time, the NYPD did not disclose any records.

On November 2, 2015, several months after trial, McGhee submitted a FOIL request to the NYPD seeking unredacted copies of all documents related to his criminal investigation and conviction. (A. 122). Although the NYPD refused to respond to the request, (A. 102), on January 4, 2016, ADA Hammer sent McGhee's counsel a *Brady* Letter, acknowledging that he had interviewed—over two years before trial—a second eyewitness to the shooting, Individual-

12

A. (A. 132). In the Letter, Hammer wrote that, after the detective "debriefed" Individual-A, Hammer himself and two other ADAs spoke with Individual-A in the detective's presence. (A. 135). Individual-A reported that he had seen a man in brown clothing walk down the 110 stairs, shoot Archie Phillips, and then go back up the 110 stairs. (A. 135). To ADA Hammer's knowledge, nobody in the room took notes. (*Id.*) ADA Hammer concluded that, even if Individual-A's account could be credited, it was "consistent with what was already known based on the investigation" and thus "cumulative." (A. 135).

However, the *Brady* Letter attached the Police Report memorializing Individual-A's detailed statement. (A. 133). In this Report, Individual-A provided a narrative of the shooting that directly contradicted Davis's testimony. (A. 133). For example, Davis described an assailant wearing a flat brim cap, while Individual-A said he was wearing a bucket hat. (*Compare* A. 973 *with* A. 133). Davis said the shooter was wearing a jacket; Individual-A did not. (*Compare* A. 973 *with* A. 133). And Davis said that the shooter "came right behind" Phillips and shot him four times in the back before walking away "at a slow pace," while Individual-A said he saw the shooter "engage[] in a conversation with . . . Phillips," shoot Phillips once, chase Phillips, shoot him 3 more times, and then run away. (*Compare* A. 973–74 *with* A. 133). Individual-A also provided a plausible avenue for alternative investigation by stating that he had heard that Phillips had robbed Social Security recipients and that the shooter was the son of one of Phillips' robbery victims. (A. 133).

After reviewing Individual-A's diverging statement, McGhee's appellate counsel met with Individual-A on November 16, 2016 in ADA Hammer's presence at the District Attorney's Office. (A. 42). The eyewitness could no longer corroborate his statement from several years prior and refused to provide any further information or to consent to future contact. (*Id.*).

13

F.        CPL § 440 Motion

In September 2017, McGhee filed a motion under New York Criminal Procedure Law §

440, asserting that his conviction violated his state and federal constitutional rights, including his

right to receive *Brady* material.  In connection with that motion, McGhee's trial lawyer provided

an affirmation detailing the pre-trial steps he took to locate witnesses who could support

McGhee's misidentification defense.  (A. 113–115).  McGhee's trial attorney also explained how

disclosure of the suppressed report, and the existence of Individual-A, would have impacted

McGhee's defense:

> I would have made every effort to interview the witness while his
> recollection of the shooting was fresh. Given that he was the only
> eyewitness other than Ms. Davis and that his recollection of the
> shooting differed from hers, it is highly likely I would have called
> him at trial. I would have also used his statement to cross-examine
> Ms. Davis about the accuracy of her recollection. Those
> opportunities are, of course, lost at this point.

(A. 115).

McGhee's trial counsel's investigator also submitted an affidavit stating that disclosure of

the report would have been "very valuable" because it "contain[ed] several strong leads," which

were essential to "conduct an effective investigation."  (A. 117–19).  Specifically, Individual-A

likely "had additional valuable information that he either did not share with the police or [the

police] did not record."  (A. 118).  The investigator would therefore have pursued the eyewitness

before his memory faded or he became uncooperative, and he would have pursued the two other

people the witness was sitting with, who likely also had relevant information about the shooting.

(A. 117–18).  The investigator also stated that the information the witness heard "on the street"

about Phillips robbing Social Security recipients was "another strong investigatory lead" that

would have led him to seek out individuals "not otherwise on [the defense's] radar—elderly or

14

disabled Polo Grounds residents—as potential sources of relevant information or leads about either the victim himself or about individuals who may have had motive to harm him." (A. 119).

In response to the CPL § 440 motion, the People conceded that the report was not disclosed until after trial, but argued that there was no "*reasonable* possibility" of prejudice. (A. 136, 139) (emphasis in original). On April 23, 2018, the court denied McGhee's CPL § 440.10 motion to vacate the judgment, finding that the Police Report was "impeaching in nature" because it "clearly gives an account of events that differs from Nicole Davis's testimony," but nevertheless concluding that it did not "contain information that would tend to exculpate the defendant." (A. 159–60). Although the Report identified the killer as someone other than McGhee, the court held that this statement was not exculpatory because the Report was "inadmissible hearsay" and not "firsthand information regarding an alternative perpetrator." (A. 160). While stating that it was "not condoning the People's failure to turn over the report," the court held that "[i]f the evidence had been disclosed there would not have been a reasonable probability of a different verdict." (*Id.*).

McGhee filed a timely notice to appeal the underlying judgment of conviction and the CPL § 440.10 motion. On December 1, 2015, the court granted him leave to appeal. On June 28, 2018, the court granted McGhee permission to appeal under CPL § 460.15 and ordered the appeals consolidated. (A. 169).

On December 19, 2019, the First Department reversed the lower court's decision. *See People v. McGhee*, 180 A.D.3d 26 (1st Dep't 2019), *rev'd,* 36 N.Y.3d 1063 (2021). The First Department concluded that the differences between Davis's testimony and the eyewitness's were "not insubstantial." *Id*. at 34. As the appellate court explained, at trial, McGhee had "little basis for questioning Davis's identification of him as the shooter" and therefore "any ability to

15

challenge her description of the assailant would have been critical to the defense in at least being able to plant a seed of doubt in the jury's mind." *Id.* Further, "given certain other infirmities in the People's evidence, such as the fact that Reynolds was testifying under a cooperation agreement and admitted to using copious amounts of marijuana around the time of the incident, it is impossible to say that even a semblance of skepticism about Davis's identification of defendant would not have tipped the jury into the realm of reasonable doubt." *Id.* The First Department was also persuaded that Individual-A's statement, which offered an alternative theory for the shooter's motive, met the materiality requirements, noting that the statement could also have been used by the defense to argue that the police failed to conduct a thorough investigation. *Id.* at 35. The First Department dismissed any attempts to minimize the importance of Individual-A's statement on the basis of the joint interview that was conducted after the witness's identity was finally revealed, explaining that the joint interview took place nearly four years after the original statement was made, and therefore it was impossible to say "whether the passage of time altered the witness's memory or motivation." *Id.* at 36.

The First Department also held that the *Brady* violation should not be "considered in isolation" from the trial errors, including the admission of Davis's identification of McGhee on surveillance video, which was tainted by Detective Morban's suggestion that she should look for somebody wearing all brown, and the admission of Davis's excited utterance. *Id.* at 36–37. The appellate court concluded that these trial errors, "coupled with the prosecution's failure to turn over the witness statement, raise a serious question as to whether defendant was deprived of [the right to a fair trial]." *Id.* at 37.

The People appealed the First Department's decision reversing McGhee's conviction. (A. 327–29). The Court of Appeals reversed the decision on March 25, 2021, remitting the case to

the Appellate Division for further proceedings.  (A. 370–72).  The Court of Appeals issued a

brief order that only addressed the *Brady* violation, summarily concluding that "there is no

reasonable probability that the People's failure to disclose the witness statement at issue

undermined the fairness of [McGhee's] trial or impacted the verdict."  (A. 371).

On May 11, 2021, on remittitur from the Court of Appeals, the First Department ruled

that the trial court should have suppressed the eyewitness's identification of defendant from a

surveillance tape, since the "all brown" description was supplied by 911 callers rather than by

Davis.  (A. 373–74).  However, the First Department held that this error was harmless since the

eyewitness subsequently made reliable line-up and in-court identifications and there was other

corroborating evidence.  (A. 374).  The court also ruled that the trial court improvidently

admitted, as an excited utterance, a detective's testimony that he overheard the eyewitness

exclaim, "that's him. That's him. He shot the boy in the Polo Ground," when she saw defendant

in the video, but that this error was harmless in light of the other evidence.  (A. 373–74).  Finally,

the First Department ruled that the trial court properly denied suppression of the line-up

identification.  (A. 374).

McGhee applied for leave to appeal to the Court of Appeals, specifically asking the court

to "review all of the remaining Federal and State Constitutional issues" presented to the First

Department, including "whether the prosecution violated Mr. McGhee's right to compulsory

process," "whether the hearing court improperly denied suppression of an identification," and

"whether the individual or cumulative effect of the errors below, including the *Brady* violation,

were harmful so as to deny McGhee a fair trial."  (A. 376–77).  On July 8, 2021, the Court of

Appeals denied leave to appeal under New York Criminal Procedure Rule § 460.20.  (A. 382).

## PROCEDURAL POSTURE

A.    Venue and Jurisdiction

At the time of this filing, McGhee is in the custody of Respondents at the Robert N.

Davoren Complex located at 11-11 Hazen Street, East Elmhurst, NY 11370.

This Court has subject matter jurisdiction over this Petition pursuant to 28 U.S.C. § 2241;

28 U.S.C. § 1331; Article I, § 9, cl. 2 of the United States Constitution; and the All Writs Act, 28

U.S.C. § 1651.  Additionally, the Court has jurisdiction to grant injunctive relief pursuant to the

Declaratory Judgment Act, 28 U.S.C. § 2201.  As enforced by Respondents, McGhee's current

detention constitutes a "severe restraint[]" on [McGhee's] individual liberty" such that [he] is "in

custody in violation of the . . . laws . . . of the United States."  *Cook v. N.Y. State Div. of Parole*,

321 F.3d 274, 277 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)).

Pursuant to 28 U.S.C. § 2241(d), venue properly lies in the Southern District of New

York because McGhee is in the custody of Respondents within the District at the time of filing of

this Petition.

B.    Exhaustion and Timeliness

McGhee exhausted his federal constitutional claims by requesting judicial review of each

claim at every level of state court proceedings.  A defendant may only bring a habeas petition

after state court avenues of relief have been exhausted.  28 U.S.C. § 2254(b)(1)(A); *see Jordan v.*

*Bailey*, 985 F. Supp. 2d 431, 436 (S.D.N.Y. 2013), *aff'd,* 570 F. App'x 42 (2d Cir. 2014) (citing

*United States ex rel. Scranton v. New York*, 532 F.2d 292, 294 (2d Cir. 1976)).  To exhaust state

court remedies, a petitioner must utilize every avenue of state court review.  *Scranton*, 532 F.2d

at 296.  He must "have set forth in state court all of the essential factual allegations asserted in

his federal petition," and must have presented his claims to the highest state court having

18

jurisdiction over them. *Daye v. Att'y Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc). An exhausted claim will "present the state courts with 'essentially the same legal doctrine' asserted in the habeas petition." *Jones v. Keane*, 329 F.3d 290, 296 (2d Cir. 2003).

McGhee has sought judicial review of the People's *Brady* violation in every possible forum. After learning of the undisclosed witness statement, McGhee brought a *Brady* claim on direct appeal. (*See* A. 183–202). McGhee raised his claim in response to the People's motion appealing the First Department's order granting his claim (A. 349–62), and again after the Court of Appeals reversed the First Department's decision, in his motion under Criminal Procedure Law § 460.15 for leave to appeal the First Department's affirmance (*See* A. 376–77). McGhee focused extensively on his *Brady* claim in his motion for collateral relief under Criminal Procedure Law § 440 and his subsequent appeal after his motion was denied. (*See* A. 1–25).

McGhee also preserved the issue of Davis's improper pretrial identification at every stage, either by bringing a claim that Davis's pretrial identification should have been suppressed or by describing the factual and legal bases for such a claim. He raised the issue that Davis's eyewitness identification should have been suppressed at the *Wade* hearing, which was denied. (*See* A. 441–42, 446–50). McGhee properly raised the issue again on appeal. (*See* A. 202–05). The First Department considered and gave credit to the issue in reversing McGhee's conviction, finding that the cumulative effect of several errors, including the suggestive identification, rendered McGhee's trial constitutionally unfair. *McGhee*, 180 A.D.3d at 36–37. The People then appealed to the Court of Appeals on the *Brady* issue only, ignoring the First Department's findings about the other serious errors in McGhee's case. (*See, e.g.*, A. 336–39).[2]

---

[2] In response, McGhee argued that "the Court [of Appeals] lacks jurisdiction to [disturb]" the First Department's findings on errors other than the *Brady* error, because the First Department reached those errors only "in the interest of justice." (A. 361–62).

On remittitur from the Court of Appeals, the First Department ruled regarding (i) the trial

court's ruling on the identification procedure; and (ii) the introduction of the eyewitness'

statement as an excited utterance.  (A. 373–75).  McGhee appealed this ruling, along with his

original conviction, and on July 8, 2021, the Court of Appeals denied leave to appeal.  (A. 382).

Accordingly, McGhee exhausted his *Brady* and identification claims and had no further recourse

left in state courts when the Court of Appeals denied leave to further appeal.  *See Ramos v.*

*Walker*, 88 F. Supp. 2d 233, 235 (S.D.N.Y. 2000) ("petitioner had no appellate remedies

available to him under New York law with respect to his Section 440.10 motion once leave to

appeal [to the First Department] was denied"); *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir.

2005) (finding that to exhaust a claim in New York state courts, "a criminal defendant must first

appeal his or her conviction to the appellate division, and then must seek further review of that

conviction by applying to the Court of Appeals for a certificate granting leave to appeal.").

Thus, further exhaustion is not required.[3]

The People argued on appeal that McGhee's pretrial identification claim was unpreserved

at trial because, at the *Wade* hearing, McGhee's trial counsel "argued only that the photo array

[shown to Davis in the pretrial identification] had to be suppressed because it was conducted too

soon after Davis had seen a particularly clear shot of defendant's face on the video," and that

McGhee made slightly different arguments about the suggestiveness of the identification

procedure on appeal.  (A. 257).  But exhaustion does not require that a claim remain identical,

down to every argument and factual detail, at each stage of proceedings.  Instead, a petitioner is

only required to present the essential factual and legal bases in support of his claim.  *See Daye*,

---

[3] McGhee also raised the issue of prosecutorial misconduct in his motion under New York Criminal Procedure Law 440.  (*See, e.g.*, A. 23–25 (bringing prosecutorial misconduct claim); A. 34 (discussing McGhee's claim that Davis misidentified him)).

696 F.2d at 191.  At the *Wade* hearing, McGhee's trial counsel did just that:  he argued that the "whole identification procedure" was suggestive because Detective Moran showed Davis the surveillance video immediately before getting her identification, and that the lineup was improperly reinforced by the suggestive photo array.  (A. 441–42).  He specifically requested that the pretrial identification be suppressed because it was "not proper under the constitutional guidelines."  (A. 442).  This is more than sufficient to preserve his claim.

Even if this Court were to find that McGhee failed to exhaust his state remedies with regard to his claim about Davis's pretrial identification, the exhaustion requirement should be waived as futile.  The exhaustion requirement does not apply where "circumstances exist that render [available state corrective process] ineffective to protect the rights of the applicant.  28 U.S.C.  § 2254(b)(1)(B)(ii).  Section 2254(b)(1)(B)(ii) applies where "further pursuit [of the issue in state court] would be futile[.]" *Lurie v. Wittner*, 228 F.3d 113, 124 (2d Cir. 2000).

Here, the People did not request leave to appeal the First Department's finding that the cumulative effect of several constitutional errors at, before, and after McGhee's trial—including Davis's pretrial identification—deprived him of his constitutional right to due process.  Even so, McGhee raised the issue in his response to the People's motion for leave to appeal, and specifically appealed the pretrial identification on remittitur.  (A. 373–77).  But the Court of Appeals did not take up the issue.  It would therefore have been both futile and counterintuitive for McGhee to argue the merits of his pretrial identification claim, which was credited on appeal to the First Department, before the New York Court of Appeals where the People did not appeal from the First Department's finding.

21

This petition is also timely; it was filed within one year of July 8, 2021, the date on which

McGhee's conviction became final.  (A. 382).  This is McGhee's first and only application for

federal habeas corpus relief.

## STANDARD OF REVIEW

A federal court must issue a writ of habeas corpus if two conditions are satisfied: (1) a

conviction violates the United States Constitution and (2) the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA") does not bar relief.  28 U.S.C. § 2241(c)(3), 2254(a),(d)(1)-(2).

Under 28 U.S.C. § 2254(d)(1), the habeas court must issue a writ if the state court's decision

either runs contrary to clearly established Supreme Court precedent, or if the state court

unreasonably applied clearly established Supreme Court precedent.  28 U.S.C. § 2254(d)(1)

(2012).  "Clearly established" precedent requires only that the Supreme Court have articulated

the governing standard, not a particular theory of the standard.  *Sellan v. Kuhlman*, 261 F.3d 303,

309 (2d Cir. 2001) (citing *Williams v Taylor*, 529 U.S. 362 (2000)).  A state court decision runs

contrary to clearly established federal law when the state court either "applies a rule that

contradicts the governing law set forth in [the Supreme Court's] cases,' or "confronts a set of

facts that are materially indistinguishable from a decision of [the Supreme] Court and

nevertheless arrives at a result different from [Supreme Court] precedent." *Fuentes v. Griffin*,

829 F.3d 233, 245 (2d Cir. 2016) (quoting *Williams*, 529 U.S. at 405–6).  When a state court

violates the "contrary to" provision by applying an incorrect legal principle, the habeas court

must review the claim de novo. *Williams*, 529 U.S. at 384 (collecting circuit authority).  "If, after

carefully weighing all the reasons for accepting a state court's judgment, a federal court is

convinced that a prisoner's custody—or, as in this case, his sentence . . . violates the

Constitution, that independent judgment should prevail."  *Id*. at 389.  If a state court has not

adjudicated a claim on the merits, a federal habeas court reviews that claim de novo. *Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003).

An unreasonable application of Supreme Court precedent occurs when a state court "identifies the correct governing legal principle," but misapplies it to a set of facts different from those of the case in which the principle was announced. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). An unreasonable state court decision requires "[s]ome increment of incorrectness beyond error," but that "increment need not be great; otherwise, habeas relief would be limited to state court 'decisions so far off the mark as to suggest judicial incompetence.'" *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (quoting *Matteo v. Superintendent*, *Sci Albion,* 171 F.3d 877, 889 (3d Cir. 1999)).

The state court decisions denying McGhee's claims ran contrary to clearly established federal law. 28 U.S.C. § 2254(d)(1) (2012). In the alternative, they unreasonably applied clearly established federal law. *Id.* For these reasons, McGhee's Petition for a writ of habeas corpus should be granted.

## ARGUMENT

## I.    THE COURT OF APPEALS' DECISION FINDING THAT THE SUPPRESSED WITNESS STATEMENT WAS NOT MATERIAL CONTRAVENED AND UNREASONABLY APPLIED CLEARLY ESTABLISHED SUPREME COURT PRECEDENT AND VIOLATED *BRADY V. MARYLAND*

The People withheld a non-cumulative eyewitness statement that would have been vital to McGhee's defense, contrary to its representation to McGhee, following multiple requests, that it had disclosed everything. This was a constitutional error in violation of the Supreme Court's mandate in *Brady v. Maryland* and its progeny. By summarily reversing the First Department's thorough opinion finding a *Brady* violation, the Court of Appeals acted contrary to Supreme

23

Court law, or in the alternative, unreasonably applied Supreme Court law.  28 U.S.C. § 2254(d)(1).

"Well-established Supreme Court precedent holds that the prosecution has a clear and unconditional duty to disclose all material, exculpatory evidence." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Exculpatory evidence includes material that is "known only to police investigators and not to the prosecutors," and "encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999); *Pfaff v. U.S.*, 989 F. Supp. 2d 301, 306 (S.D.N.Y. 2013) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972) (noting that *Giglio* extended the *Brady* rule to "material impeachment evidence").  Material evidence also includes that which may lead to new lines of investigation.  *See Kyles v. Whitley*, 514 U.S. 419, 447 (1995).  "[W]hether . . . a failure to disclose is in good faith or bad faith, the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." *Kyles*, 514 U.S. at 437–38.

"There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Boyette v. Lefevre*, 246 F.3d 76, 89 (2d Cir. 2001) (quoting *Strickler*, 527 U.S. at 281–82)) (emphasis in original).  The standard is the same regardless of whether the suppressed evidence is exculpatory or impeaching.  *See United States v. Coppa (In re United States)*, 267 F.3d 132, 140 (2d Cir. 2001).  The "touchstone of materiality is a 'reasonable probability' of a different result." *Kyles*, 514 U.S. at 434.  All three elements of a *Brady* violation exist here.

24

A.      The Suppressed Eyewitness Statement was Not Disclosed and was Favorable to
         the Defense

The People conceded that the first two prongs of the *Brady* analysis are met here:  the

suppressed witness statement, the Police Report of Individual-A's statement, was favorable to

the defense, and the People knew of its existence (indeed, the ADAs and case detectives

*interviewed* the eyewitness in question), and yet failed to produce it to McGhee before trial as

required under the law and otherwise in response to his specific requests.  (A. 132–33).  Thus,

the sole question is of materiality.  As set forth below, because the People's suppression of

Individual-A's statement prejudiced McGhee—as the First Department held—this Court must

grant the Petition, regardless of the People's intentions.  *See Giglio*, 405 U.S. at 154.

B.      The People's Failure to Disclose Individual-A's Statement was Material and
         Prejudicial

Evidence is material within the meaning of *Brady* when "'there is a reasonable

probability that, had the evidence been disclosed, the result of the proceeding would have been

different.'"  *United States v. Hunter*, 32 F. 4th 22, 31 (2d Cir. 2022) (quoting *Turner v. United

States,* 137 S. Ct. 1885, 1893 (2017)).  "[A] showing of materiality does not require

demonstration by a preponderance that disclosure of the suppressed evidence would have

resulted ultimately in the defendant's acquittal."  *Kyles*, 514 U.S. at 434.  As the Supreme Court

has explained, "[t]he question is whether in its absence he received a fair trial, understood as a

trial resulting in a verdict worthy of confidence."  *Id.* (quoting *United States v. Bagley*, 473 U.S.

667, 678 (1985)).  Under that standard, a "defendant need not demonstrate that after discounting

the inculpatory evidence in light of the undisclosed evidence, there would not have been enough

left to convict."  *Id.* at 434–35.  He need not even show "that he 'more likely than not' would

have been acquitted had the new evidence been admitted."  *Wearry v. Cain*, 577 U.S. 385, 392,

25

136 S. Ct. 1002, 1006 (2016) (quoting *Smith v. Cain*, 565 U.S. 73, 75, 132 S. Ct. 627, 630 (2012) (internal quotation marks and brackets omitted)).  "He must show only that the new evidence is sufficient to undermine confidence in the verdict."  *Id.* (internal quotations omitted).

The People's decision not to disclose Individual-A's statement—despite knowing of its existence, its constitutional obligation to do so, and the fact that McGhee specifically requested all witness statements taken in his case—was material and in violation of *Brady* for at least three reasons.  **First**, disclosure of Individual-A's statement would have allowed the defense to impeach the only eyewitness in the People's case.  **Second**, the statement contained an exculpatory lead supporting an alternative defense or perpetrator theory.  **Third**, the statement would have allowed the defense to call into question the thoroughness and reliability of the police's investigation.  *See People v. McGhee*, 180 A.D.3d 26, 34–45, (1st Dept. 2019).  Each basis alone is proof of materiality and a *Brady* violation.  And considered together, there can be no question that the failure to disclose Individual-A's statement weakened Mr. McGhee's defense and strengthened the People's case.

### 1.    *Individual-A's statement would have impeached Davis's testimony*

Undisclosed evidence may be considered material under *Brady* where it would have allowed the defense to impeach an important witness.  *See Wearry*, 577 U.S. at 392 (finding withholding of favorable information to the defense caused prejudice where the prosecution's case was "built on the jury crediting [the star witness's] account rather than [the defendant's]").  The important question is whether the impeachment material that was suppressed is more persuasive or convincing than the impeachment evidence presented at trial." *Dennis v. Sec'y, Pa. Dep't of Corr*., 834 F.3d 263, 300 (3d Cir. 2016) (citing *Slutzker v. Johnson*, 393 F.3d 373, 387 (3d Cir. 2004)).  Impeachment evidence is more likely to be material where it is not corroborated

by other testimony or where the witness has not been impeached by other means.  *Cf. United*

*States v. Orena*, 145 F.3d 551, 559 (2d Cir. 1998) ("It is well settled that where ample

ammunition exists to attack a witness's credibility, evidence that would provide an additional

basis for doing so is ordinarily deemed cumulative and hence immaterial"); *United States v.*

*Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995) (same).  Indeed, "when positive identifications by

eyewitnesses played a significant role at trial, yet there were other eyewitnesses who had made

positive statements to the effect that [petitioner] was not the person involved in the crime," there

is '*no question*' that the testimony of the latter eyewitnesses 'would have been material.'"

*Nnodimele v. Derienzo*, No. 13-CV-3461, 2016 WL 337751, at *18 (E.D.N.Y. Jan. 27, 2016)

(citing *United States. ex rel. Meers v. Wilkins*, 326 F.2d 135, 140 (2d Cir. 1964) (emphasis

added)).

The People's suppression of Individual-A's statement deprived McGhee of the ability to

impeach the testimony of Nicole Davis—the only eyewitness to the shooting who was largely

unimpeached at the trial, other than through her own prior statements—and thus undermined the

jury's confidence in her account of the shooting.  If given the opportunity, McGhee could have

cross-examined Davis on several key inconsistencies between her account of the shooting and

Individual-A's, including:

- Davis testified that the shooter was wearing a flat brim cap with a snap in front. (A. 973).  By contrast, Individual-A stated that the shooter was wearing a bucket hat.  (A. 133).

- Davis testified that the shooter "came right behind [Phillips] and shot him right in the back four times."  (A. 973).  By contrast, Individual-A stated that the shooter engaged Phillips in conversation, shot him once in the *front,* and then shot him three times in the back while chasing him.  (A. 133).

- Davis testified that the shooter "walk[ed] out in a slow pace" after the shooting, (A. 974).  Individual-A testified that the shooter ran up the stairs and out of the Polo Grounds.  (A. 133).

At the very least, Individual-A's account would have shown the jury that Davis's recollection of the shooting was inconsistent with other evidence.  (A. 117).

But the undisclosed statement did far more than simply call Davis's credibility into question: it provided an alternative account of the shooting, which was not only inconsistent with McGhee's guilt, but also consistent with the forensic evidence.  Individual-A described: (1) a shooter who was attired differently from the shooter depicted by Davis's testimony; (2) a shooter who first spoke to the victim and then shot him from both the front and back while chasing him, rather than a sneak attack from the back as Davis described; and—crucially—(3) a shooting committed by someone who was the son of one of Phillips' robbery victims—which was indisputably not McGhee.

The jury should have had the chance to evaluate both accounts and decide which was more credible.  And it may well have determined that Individual-A's account was the more credible one, or at a minimum cast doubt on the credibility of Davis's account, creating a reasonable probability that the jury would have found the People to have not met its hefty burden of proof beyond a reasonable doubt.

Indeed, Individual-A's account—but not Davis's account—is consistent with the forensic evidence, which showed that Phillips had been shot in the shoulder from the front.  (A. 1590). Dr. Borck testified that the victim received four gunshot entrance wounds, one re-entrance wound, and one exit wound.  (A. 1588).  He testified that the forensic evidence was consistent with two bullets shooting Phillips in the back, one bullet entering from the front of his chest on the left side, and one from the outside of the left arm.  (A. 1574–84, 1588, 1590–94).  Each wound is consistent with Individual-A's account of the shooting, in which the shooter shot Phillips once from the front before Phillips turned around and started running away.  Davis's

account of a stealth attack from the back is completely irreconcilable with both Phillips' wound from the front and his wound from the side.

The suppression of key impeachment evidence like Individual-A's statement is contrary to established *Brady* precedent.  In *Leka v. Portuondo*, 257 F.3d 89, 105 (2d Cir. 2001), the Court of Appeals for the Second Circuit found that testimony from an undisclosed eyewitness "would have had seismic impact" at trial "because his testimony would have furnished the defense with promising lines of inquiry for the cross-examination" of two eyewitnesses, who provided "the sole evidence at trial connecting [the defendant] to the shooting."  *Id.* at 104. Other courts in this Circuit have similarly found that impeachment evidence is material where, as in this case, it would have served as the defense's primary means for impeaching the government's star witness.  *See, e.g.*, *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002) (finding evidence material where it undermines credibility of prosecution witness) (quoting *Leka*, 257 F.3d at 98) (finding material evidence includes evidence "having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.") (internal citation omitted); *United States v. Washington*, 294 F. Supp. 2d 246, 250 (D. Conn. 2003) (finding there was "no question" of materiality of impeachment evidence where it "provided the central means by which the defendant could impeach the Government's deceased key witness."); *Nnodimele*, 2016 WL 337751, at *19 (finding that evidence which would have impeached key eyewitnesses was material); *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 124 (2d Cir. 2015) (finding evidence material where it impeached only witness to directly link defendant to the crime).  Other Circuits have reached the same conclusion.  *Monroe v. Angelone*, 323 F.3d 286, 316 (4th Cir. 2003) (granting *Brady* claim where undisclosed evidence impeached one witness);  *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 560–61 (4th Cir. 1999) (same); *Crivens v. Roth*, 172 F.3d 991, 998–99

(7th Cir. 1999) (same).  Particularly relevant here, the Third Circuit has held that prosecutors' failure to disclose impeachment evidence was material where it "ma[d]e the only admitted eyewitness statement in the case 'unassailable.'"  *Dennis*, 834 F.3d at 294.

As in *Dennis*, Davis was the People's only eyewitness who testified at trial.  Her testimony was largely unimpeached, and certainly was not called into question by other witnesses or other accounts of the shooting.  Had McGhee and his trial counsel been aware of Individual-A's statement, and had that statement been properly disclosed and admitted prior to trial, it would have served as the primary means of impeaching this sole eyewitness account.  By failing to disclose Individual-A's statement, the People protected its own witness from damaging impeachment evidence and cross-examination, while depriving McGhee of his constitutional right to a fair trial.

Among other things, McGhee's counsel could have called the eyewitness to the stand and trial counsel could have questioned him about his account of the shooting, distinguishing Davis's account and presenting a conflicting narrative to the jury.  Even if the eyewitness did not testify, trial counsel could have used his statement as a tool to more effectively cross-examine Davis and cast doubt on her recollection of the shooting.  The jury, faced with the material differences in the two eyewitness accounts, would be significantly less likely to credit Davis's testimony.

And, as a result, the jury's confidence in the People's otherwise feeble case against McGhee would likely diminish.  Nicole Davis was the only eyewitness to Archie Phillips' shooting to testify at McGhee's trial, (A. 1147–48), and by the People's own admission, it viewed Davis's testimony alone as sufficient to convict McGhee.  (A. 2002).  It must necessarily be the case then, based on the People's own representations, that critical evidence that impeaches the People's star witness—that they told the jury it could rely upon alone to convict—is

necessarily material.  Moreover, the *only* other witness testimony directly implicating McGhee was from cooperating witness John Reynolds, who: (i) did not see the shooting, (ii) testified pursuant to a cooperation agreement,[4] and (iii) admitted to smoking marijuana "excessively" at the time of the shooting and had "no clear memory of details."  (A. 1637, 1648, 1686).  The remaining witnesses, Tuitt, Rodriguez, and Santiago, had no direct knowledge of the shooting. (A. 1242–43, 1264, 1860–67, 1919).  Nor did the forensic evidence support Davis's—and the People's —account of the crime: the forensic evidence showed that Phillips' bullet wounds were consistent with a shooting that happened at least partially from the front and not (as Davis contended) entirely from the back.  (A. 1574–84, 1588, 1590–94).

All told, the People could point to almost nothing to directly support McGhee's guilt other than Davis's testimony.  Had it not given Davis's testimony full credit, the jury would have assessed McGhee's guilt against the backdrop of (i) highly unreliable cooperator testimony; (ii) testimony from witnesses who did not observe the shooting and had no knowledge of it; (iii) inconclusive forensic evidence, and (iv) a surveillance video that depicts McGhee at the Polo Grounds around the time of the shooting, but does not depict the shooting itself.  This evidence is far from "considerable," as the Court of Appeals contends.  (A. 372).[5]  The People's case was weak even with the full benefit of Davis's testimony, and if McGhee had the ability to impeach her account of the shooting, it would have been entirely unconvincing.

---

[4] Cooperator testimony is inherently suspect and is treated with increased scrutiny.  *See United States v. Dizon,* 511 F. App'x 48, 51 (2d Cir. 2013) (finding jury properly considered testimony of immunized witness with additional scrutiny) (citing *United States v. Gleason*, 616 F.2d 2, 16 (2d Cir. 1979) ("[T]estimony of certain types of witnesses may be suspect and should therefore be scrutinized and weighed with care, such as that of accomplices or coconspirators.")).

[5] The Court of Appeals' reference to "testimony of additional witnesses who described the perpetrator's clothing and his movements following the shooting; telephone records, and surveillance videos showing defendants' proximity, clothing, and behavior immediately after the crime," (A. 372), is a red herring.  That evidence may place McGhee at the Polo Grounds after the shooting, but it does not show that he perpetrated the shooting.

2.    *Individual-A's statement would have led McGhee to investigate new leads*

The undisclosed Individual-A statement contained a plainly exculpatory lead:  the witness stated that Phillips was shot by a son of one of his robbery victims, and McGhee is not the son of one of Phillips' robbery victims.  Had this lead been properly and timely disclosed to McGhee and his counsel, they could have pursued it to identify alternative suspects in Phillips' murder.

"[N]ew evidence suggesting an alternate perpetrator is 'classic *Brady* material.'" *Williams v. Ryan*, 623 F.3d 1258, 1265 (9th Cir. 2010) (citing *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir. 2001)); *see Brady*, 373 U.S. 83; *Kyles*, 514 U.S. at 442–50.  An accused has the right to defend himself on the grounds that someone else committed the crime for which he is charged. *See Banks v. Reynolds*, 54 F.3d 1508, 1517–18 (10th Cir. 1995).  Accordingly, courts routinely find undisclosed evidence material where it suggests someone other than the defendant committed the offense.  For example, in *Williams v. Ryan*, the Ninth Circuit found that jailhouse letters identifying an alternative suspect were material for *Brady* purposes.  623 F.3d at 1265.  In *Mendez v. Artuz*, 303 F.3d 411 (2d Cir. 2002), the Second Circuit found that evidence that an alternative suspect had a contract out for the victim's life was material because it provided "a possible alternative perpetrator *and* motive." *Id.* at 413.  And in *Clemmons v. Delo*, 124 F.3d 944 (8th Cir. 1997), the Eighth Circuit found that an investigative report stating that a witness had identified an alternative suspect as the perpetrator was material. *Id.* at 947, 950–53.  *Dennis*, too, is on point:  in that case, the Third Circuit found that an investigative statement was material where it showed an eyewitness had identified the perpetrator as attending a different school than the defendant. *Dennis*, 834 F.3d at 302; *see also Juniper v. Zook*, 876 F.3d 551, 565 (4th Cir. 2017) (finding petitioner should have been granted evidentiary hearing on *Brady* claim where

undisclosed investigatory interview identified alternative perpetrator); *United States v. Curry*, 57 F.3d 1071 (Table), 1995 WL 331471, at *1 (6th Cir. June 2, 1995) ( "[Witness's] statement that directly contradicts Robinson's identification . . . is material in that it identifies another individual in possession of the guns[.]"); *Floyd v. State*, 902 So. 2d 775, 784–85 (Fla. 2005) (holding statement by witness identifying other perpetrators of crime material).

Disclosure of Individual-A's statement could have led McGhee to uncover an entirely new defense theory by searching for and interviewing individuals familiar with Phillips' robbery victims. Had that line of inquiry proved fruitful, McGhee could have presented an alternative suspect to the jury.[6] In light of the otherwise thin evidence against McGhee, there is certainly a "reasonable probability" that the jury would have doubted his guilt when faced with a choice between two or more suspects. Instead, the People disclosed the eyewitness statement months after trial, and by the time McGhee's appellate counsel had the opportunity to interview Individual-A, he could no longer corroborate his statement or point to any potential interview subjects. (A. 41). Failure to disclose the eyewitness's exculpatory lead was prejudicial error.

> 3.     *Individual-A's statement would have called the police's investigation into question*

The suppressed eyewitness statement is material for a third related and also independent reason: it would have provided an opportunity for McGhee to challenge the adequacy of the police's investigation into Phillips' shooting. Evidence is especially important under *Brady* where trial counsel "could have examined the police to good effect . . . and so have attacked the reliability of the investigation[.]" *Kyles*, 514 U.S. at 446. "[I]ndications of conscientious police work will enhance probative force and slovenly work will diminish it." *Id*. at 446 n.15; *see also*

---

[6] The fact that Individual-A's statement regarding the shooter's identity would be inadmissible at trial under the rule against hearsay is irrelevant; the question is whether the statement could have *led* to admissible evidence. *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002).

*Dennis,* 834 F.3d at 302 ("Counsel could also have used the information to challenge the adequacy of the police investigation."); *Mendez v. Artuz*, 303 F.3d 411, 416 (2d Cir. 2002) (finding defense could have used suppressed evidence suggesting a suspect with an alternative motive "to challenge the thoroughness and adequacy of the police investigation"); *Smith v. Sec'y of N.M. Dep't. of Corr.*, 50 F.3d 801, 830 (10th Cir. 1995) ("[W]hile the knowledge the police were investigating [the alternative suspect] would arguably carry significant weight with the jury in and of itself, that fact would also have been useful in discrediting the caliber of the investigation or the decision to charge the defendant, factors we may consider i[n] assessing whether a *Brady* violation occurred.") (internal quotation marks omitted).

The suppressed statement opens at least three potential lines of investigation, none of which the police pursued:

- The police could have investigated potential subjects attired the way the Individual-A described, in "[a] beige bucket hat, darker beige shirt and khakis," as compared to the suspect as Davis described (wearing a jacket and a flat-brim cap).

- The police could have investigated the eyewitness's theory of how the shooting unfolded by seeking out additional video surveillance or other evidence corroborating the eyewitness's statement that Phillips was shot once in the front, then three times in the back after a chase, as compared to the shooting as Davis described (four shots from the back only).

- The police could have investigated the eyewitness's statement that the shooter was "the son of one of [Phillips'] robbery victims," and could have interviewed individuals familiar with Phillips' robbery targets and relevant witnesses.

The police—who in fact had the undisclosed statement of Individual-A—entirely ignored all of these potential investigatory leads. Instead, they glossed over the key differences between Davis's account and Individual-A's, and buried his account on the incorrect claim it was cumulative to Davis's. This approach was unreasonable in light of the plain differences between the accounts, and it is entirely contrary to the Supreme Court's mandate in *Kyles* that

prosecutors' *Brady* determinations should account for the defense's ability to challenge the thoroughness of the police's investigation. *See Kyles*, 514 U.S. at 446.

In short, the suppressed witness statement is a crucial piece of evidence that could have served as a touchstone to McGhee's defense. The statement could have carried great weight at trial, especially to the extent it could have deflated the outsized value of Davis's testimony to the People's otherwise flimsy case. Admission of the statement could have set the People's case in an entirely new light and undermined the jurors' assurance in McGhee's guilt. Its suppression violated McGhee's constitutional right to due process and the Supreme Court's mandate in *Brady*, and compels the court to grant McGhee's Petition.[7]

## II. THE COURT OF APPEALS' UPHOLDING OF MCGHEE'S CONVICTION IN LIGHT OF THE ERRONEOUS EVIDENTIARY RULINGS WAS AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT PRECEDENT

McGhee's constitutional right to due process of law was further violated by the trial court's decision to improperly admit both Davis's pre-trial identifications of McGhee and her surveillance-footage identification of him as an excited utterance.

An erroneous state evidentiary ruling qualifies as a constitutional violation "where [the] petitioner can show that the error deprived [him] of a fundamentally fair trial." *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) (internal quotation marks omitted). The test for "fundamental fairness" is whether the evidence, "evaluated in the context of the entire record, create[d] a reasonable doubt [regarding petitioner's guilt] that did not otherwise exist." *Taylor v.*

---

[7]  The Court of Appeals' decision similarly fails under New York's more lenient materiality standard, which requires only a reasonable possibility that the outcome of the trial would have been different had the suppressed evidence been disclosed. *People v. Vilardi*, 76 N.Y.2d 67, 77 (1990). The Court of Appeals simply noted that there was "considerable" evidence against McGhee (A. 372), but failed to analyze how the People's suppression of Individual-A's statement could have contributed to the jury's decision.

*Curry*, 708 F.2d 886, 891 (2d Cir. 1983) (quoting *United States v. Agurs*, 427 U.S. 97, 112–13, 96 S. Ct. 2392, 2401–02 (1976)) (internal quotation marks omitted and alterations in original). By permitting Davis's initial identification of McGhee, as well as the subsequent tainted identifications, and her hearsay statement identifying him, the state court deprived McGhee of his fundamental right to a fair trial in violation of the Constitution.

    A.    <u>The Pretrial Identifications of McGhee Were Improperly Suggestive</u>

    A defendant's right to due process includes the right not to be the object of pretrial identification procedures that are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968); *accord, e.g., Perry v. New Hampshire*, 132 S. Ct. 716, 720 (2012); *Manson v. Brathwaite*, 432 U.S. 98, 106 n.9, 114, 97 S. Ct. 2243, 2249 n.9, 2253 (1977).

    "When the prosecution offers testimony from an eyewitness to identify the defendant as a perpetrator of the offense, fundamental fairness requires that that identification testimony be reliable." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). The Supreme Court has articulated a clearly established two-step test to determine admissibility of an identification that relies on a suggestive procedure. First, the court must determine whether the procedure was so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons,* 390 U.S. at 383–84. Second, if the procedure is found to have been impermissibly suggestive, any evidence relating to or derived from the initial identification of the defendant may be admitted at trial *only* if the People can show that, under the totality of the circumstances, the identification had an "independently reliable" source. *United States v. Maldonado-Rivera*, 922 F.2d 934, 973–74 (2d Cir. 1990) (citing *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253 (1977)).

To ascertain whether an identification "has reliability independent of the unduly suggestive identification procedures," *Raheem*, 257 F.3d at 135, courts generally consider: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Brisco v. Ercole*, 565 F.3d 80, 89 (2d Cir. 2009).

### 1.    Davis did not initially describe the shooter

As described above, the principal evidence presented by the People was the eyewitness identification and testimony of Davis. Davis testified at trial that was she was "positively sure" McGhee was the shooter. (A. 1003). She identified McGhee in court, and she testified about her prior positive line-up identification. (A. 1003–05). In other words, to a jury, her identification of McGhee as the shooter seemed nearly unimpeachable.

But Davis did not immediately tell police she could describe the shooter, and certainly did not inform the police (or other individuals that she discussed the shooting with in the immediate aftermath of the shooting) that she had seen the shooter before. Indeed, the first time she spoke with the police, on November 14, 2011, the police described her as "being very vague in describing who the shooter was." (A. 1022, 1035–36, 1171–72). In fact, she did not offer any other description or identification information until *after* she viewed the surveillance footage of the sidewalk near the shooting. (A. 439, 1171–72). At that point, the police had already told her to watch for "anyone matching the description of all brown." (A. 435). It is therefore no surprise that when McGhee appeared on the video wearing brown clothing, Davis identified him as the shooter.

Then the *same day* that she saw McGhee's face on the video footage, Davis identified

McGhee from a photo array. Davis also subsequently identified McGhee from a line-up, but

only *after* the detective told Davis to select anyone she recognized from the photo array:

> THE WITNESS: I said, I asked the witness, I told the witness if the
> person, if you recognize the person that you, from the photo array.
>
> STATE: Was it from the photo array or from anywhere from the
> shooting?
>
> THE WITNESS: From the shooting also.

The police's "all brown" comment therefore tainted each and every step of the identification

procedure, and the trial court should have suppressed Davis's subsequent photo array and line-up

identifications.

### 2.    *The initial identification was improperly suggestive*

On appeal, the First Department ruled that the trial court should have suppressed Davis's

identification on the surveillance tape, because it was "unduly suggestive," but that this failure

was harmless error in light of the other evidence. (A. 373–75). The court also held that Davis's

line-up identification was properly admitted. (*Id.*). This decision fails, however, to grapple with

the fact that Davis's initial identification of McGhee was tainted by the police's suggestive

remarks – and therefore, all of her subsequent identifications were tainted. The People has the

burden to prove the existence of an independent, reliable source for Davis's identification. But

there is no reason to believe that Davis would have *ever* identified McGhee, in the initial video,

the photo array, or the line-up, had the police not directed her towards him in the first instance.

That is fundamentally unfair.

There is nothing inherently suggestive in obtaining an eyewitness identification by

showing a witness a surveillance video, "*provided* that the defendant [is] not singled-out,

38

portrayed unfavorably, or in any other manner prejudiced by police conduct or comment."

*People v. Davis*, 115 A.D.3d 1167, 1169, 982 N.Y.S.2d 230, 233 (4th Dep't 2014), *leave to*

*appeal denied*, 23 N.Y.3d 1019, 992 N.Y.S.2d 802, 16 N.E.3d 1282 (2014) (emphasis added).

The Supreme Court has repeatedly recognized that the manner in which the police presents the

suspect to a witness for identification can introduce a degree of suggestion into the identification

process that inherently risks misidentification.  *See Perry*, 565 U.S. at 243; *United States v.*

*Wade*, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933 (1967).  Illustrating methods of improper

suggestion, the Court:

> [P]ointed to police-designed lineups where 'all in the lineup but the
> suspect were known to the identifying witness, . . . the other
> participants in [the] lineup were grossly dissimilar in appearance to
> the suspect, . . . only the suspect was required to wear distinctive
> clothing which the culprit allegedly wore, . . . the witness is told by
> the police that they have caught the culprit after which the defendant
> is brought before the witness alone or is viewed in jail, . . the suspect
> is pointed out before or during a lineup, [and] . . . the participants in
> the lineup are asked to try on an article of clothing which fits only
> the suspect.'

*Perry*, 565 U.S. at 243 (quoting *Wade*, 388 U.S. at 233).  In each of the scenarios, the police

steered the witness toward the identification of a certain person.  *See also People v. Gambale*,

150 A.D.3d 1667, 1669, 54 N.Y.S.3d 800, 802 (4th Dep't 2017) (procedure was suggestive

where "the investigator 'singled out' defendant" just before asking the witness to view

surveillance video).  That is precisely what occurred here.

Addressing a similar question in the context of a line-up, the Second Circuit has also

cautioned that the presence of only one person wearing a shirt of the color described by

witnesses would be impermissibly suggestive.  *Cannon v. Montanye*, 486 F.2d 263 (2d Cir.

1973), *cert denied*, 416 U.S. 962, 94 S. Ct. 1982 (1974); *see also Jarrett v. Headley*, 802 F.2d

34, 41 (2d Cir. 1986) (the central question in determining the suggestiveness of a photo array is

"whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit'") (quoting *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir.1984)) (alteration in original). In *Raheem v. Kelly*, the Second Circuit held that the identification procedures were suggestive and the identifications unreliable where the defendant in a line-up was wearing a leather coat matching the description of the coat that eyewitnesses saw the shooter wearing. 257 F.3d 122, 135–140 (2d Cir. 2001).

Here, the police's suggestion that Davis should scan the video for someone wearing "all brown" was equally suggestive, and tainted Davis's original identification and the subsequent identifications. Detective Morban's improper comment at the line-up—that Davis pick out anyone "from the photo array"— further compounded the issues with each identification procedure.

3. *There is no independent basis to trust Davis's identification of McGhee*

Under the totality of the circumstances, there is no independent basis to trust that Davis's identification of McGhee was sufficiently reliable. Taking each factor in turn, Davis only had a limited ability to view the shooter at the time of the crime. For instance, she testified that she was not close enough to see the gun. (A. 1042). As to the second factor, Davis's testimony was internally inconsistent, casting doubt on her ability to see the shooter clearly. *See supra* 9–10. As to the third factor, there's no evidence that Davis described McGhee prior to viewing the video. Turning to the fourth factor, Davis expressed strong certainty that McGhee was the shooter, but that certainty was likely supported by the police's suggestive remarks. Davis testified that she had previously seen McGhee twice in situations unrelated to the shooting. (A. 975–77). But if she *had* recognized him as the shooter, the question must be asked why she did

40

not inform the police when she first spoke to them—the day before she saw the surveillance

footage.  As to the final factor, the original identification was close in time to the shooting, but as

explained above, it, and the subsequent identifications, were tainted by the police officer's

comment.

### 4.    The suggestive identification was far from harmless

Nor can it reasonably be concluded that the identifications were harmless.  A violation is

not harmless error when it cannot be said "with fair assurance . . . that the judgment was not

substantially swayed by the error."  *Nappi v. Yelich*, 793 F.3d 246, 253 (2d Cir. 2015) (quoting

*Kotteakos v. United States*, 328 U.S. 750, 765, 66 S. Ct. 1239, 1248 (1946)).  The factors to be

considered in applying the harmless error analysis include:  "the importance of the witness'

testimony in the prosecution's case, whether the testimony was cumulative, the presence or

absence of evidence corroborating or contradicting the testimony of the witness on material

points, the extent of cross-examination otherwise permitted, and, of course, the overall strength

of the prosecution's case." *Del. v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986).

When the People has a relatively weak case hinging on a *single* eyewitness, that

eyewitness's identification of the defendant cannot be considered trivial.  Indeed, in summation,

the prosecutor explicitly focused on Davis's pre-trial identifications, arguing that it was "really

the lineup . . . [and] the video" that was "dispositive."  (A. 2012).  Without these pretrial

identifications, Davis's testimony would have been far less powerful.  This would have created

reasonable doubt regarding McGhee's guilt that did not otherwise exist.

### B.    The Witness's Hearsay Was Improperly Admitted

The trial court also improvidently admitted Davis's surveillance-footage identification of

McGhee ("That's him. That's him …") as an excited utterance.  Davis made the statement

approximately 11 hours after the shooting while watching a video recording of McGhee walking

down a sidewalk. Her statement, which bolstered her in-court identification, was not an excited

utterance. On appeal, the First Department held as much, finding that under the circumstances,

the statement did not qualify as an excited utterance, but that it was nevertheless harmless error.

(A. 373–75). The state court ruling admitting Davis's statement ran contrary to clearly

established Supreme Court precedent.

In *White v. Illinois*, 502 U.S 346, 112 S. Ct. 736, 742 n. 8 (1992), the Court recognized

that "spontaneous declarations" – which describes the same category of statements as the term

"excited utterances" used in the courts of New York – fell within a traditional hearsay exception.

*Id.* at 355 n. 8. This doctrine permits the admissibility statements made "in a moment of

excitement–without the opportunity to reflect on the consequences of one's exclamation."

*White*, 502 U.S. at 356; *see also* Fed. R. Evid. 803(2) (providing for the admission of hearsay

statements "relating to a startling event or condition made while the declarant was under the

stress of excitement that it caused"). Such assertions of fact are thought to be reliable because

the declarant, in a state of excitement, is unlikely to muster the reflection necessary for

fabrication. *Brown v. Keane*, 355 F.3d 82, 90 (2d Cir. 2004) (quoting *People v. Brown*, 80

N.Y.2d 729, 736, 610 N.E.2d 369, 374 (1993)); *see also People v. Edwards*, 47 N.Y.2d 493, 497,

392 N.E.2d 1229 (1979) (the "decisive factor" for determining admissibility is "whether the

surrounding circumstances reasonably justify the conclusion that the remarks were not made

under the impetus of studied reflection[.]"). In other words, "'[a]n excited utterance occurs

under the immediate and uncontrolled domination of the senses, and during the brief period

when considerations of self-interest could not have been brought fully to bear by reasoned

reflection.'" *Mungo v. Duncan*, 393 F.3d 327, 331 (2d Cir. 2004) (quoting *People v. Cotto*, 92

N.Y.2d 68, 78–79, 699 N.E.2d 394 (1998)).  New York also has a policy favoring narrow treatment of this hearsay exception.  *See People v. Maher*, 89 N.Y.2d 456, 461 (1997).

Here, the purported excited utterance by Davis was not "made under the stress" of the shooting and did not have the requisite indicia of reliability.  Instead, the statement was made the day after the shooting, while in the safety of the police station, rather than at the Polo Grounds.  During the passage of that day, Davis had more than enough time to collect her thoughts and reflect upon the day's events.  *See Brown*, 355 F.3d at 90 (the exception applies where one speaks "without the opportunity to reflect on the consequences of one's exclamation"); *Hansen v. Smith*, No. 9:04-CV-574 (GLS), 2008 WL 3925637, at *11 (N.D.N.Y. Aug. 20, 2008) (statement did not qualify as an excited utterance since fifteen hours had passed and the record shows the witness had time to deliberate and reflect after the incident); *People v. Breland*, 292 A.D.2d 460 (2d Dept. 2002) (victim's statement to 911 operator 30 minutes after robbery should not have been admitted as excited utterance based on, among other things, "the amount of time that elapsed" before the statement).

Nor, for the reasons explained above, can the decision to admit Davis's hearsay be considered harmless.  Admitting Davis' statement further compounded the fundamental unfairness of the identification procedures that led to McGhee's arrest and ultimately, his conviction.

## III.    CUMULATIVELY, THESE ERRORS REQUIRE THAT THE PETITION BE GRANTED

The Second Circuit recognizes a "cumulative error" rule for reversal of a conviction or habeas relief.  *See, e.g.*, *Sanders v. Sullivan*, 701 F. Supp. 1008, 1012 (S.D.N.Y. 1988) (citing *United States v. Alfonso–Perez*, 535 F.2d 1362 (2d Cir. 1976)).  In order for a cumulative error claim to be the basis for federal habeas relief, it must first be shown that the alleged individual

errors were erroneous court rulings. *Joyner v. Miller*, 01 Civ. 2157 (WHP) (DF), 2002 WL

1023141 (S.D.N.Y. Jan. 7, 2002). If actual errors are discovered but it cannot be shown that one

of those errors requires reversal of the conviction, then the "whole body of error is to be assessed

for prejudicial effect." *Sanders*, 701 F. Supp. at 1013. "[I]n order for the cumulative effect of

errors to warrant a new trial, the claimed errors must be 'so prejudicial that they rendered

petitioner's trial [ ] fundamentally unfair.'" *Joyner*, 2002 WL 1023141 at *13 (quoting *Collins v.

Scully*, 878 F. Supp. 452, 460 (E.D.N.Y.1995) (alterations in original)).

 McGhee was convicted due to the unlawful withholding by police and prosecutors of

evidence favorable to his defense, in violation of his constitutional right to due process and a fair

trial under the United States Constitution. As the First Department found, the myriad trial errors

were "compounded" by the People's *Brady* violation. *McGhee*, 180 A.D.3d at 37. The People's

decision to introduce these improper identifications and the excited utterance bolstered Davis's

credibility, while their decision to withhold the identity of Individual-A deprived McGhee of the

opportunity to impeach Davis or the police's investigation, or otherwise explore or introduce an

alternative perpetrator theory. Each of the errors described above are, standing alone, sufficient

to require reversal of McGhee's conviction, but in combination, they are proof that he simply did

not receive a fair trial.

 From the outset, the People knew that McGhee's defense was that he was misidentified,

and that the viability of that defense depended on his ability to cast doubt on Davis's

identification of him as the shooter. Despite the defense's repeated requests for information

about other witnesses, and the People's obligation to turn over *Brady* material, the People

concealed that a second eyewitness gave a statement to police that impeached Davis's account

and provided other valuable exculpatory information. Then, at every turn, McGhee was denied

the opportunity to meaningfully challenge the credibility of Davis's testimony.  The trial court improvidently permitted the People to introduce Davis's video identification of McGhee.  Then the trial court allowed the People to introduce Davis's out-of-court hearsay statement.  The People repeatedly emphasized to the jury that Davis was the "one witness that actually observed the shooting."  (A. 2002).  And all the while, the People withheld vital evidence that hamstrung McGhee's ability to impeach this "one witness" and would have permitted the defense to introduce witness testimony that conflicted—or, at a minimum called into doubt—Davis's statements.  In short, at every step, the People hampered McGhee's ability to mount a persuasive defense.  Viewed cumulatively, these errors require reversal of McGhee's conviction.

## CONCLUSION

The petition for habeas corpus relief should be granted.

PATTERSON BELKNAP WEBB & TYLER LLP

*/s/   Lauren Schorr Potter*
Lauren Schorr Potter
H. Gregory Baker
Devon Hercher
Amanda First
lspotter@pbwt.com
hbaker@pbwt.com
dhercher@pbwt.com
afirst@pbwt.com
1133 Avenue of the Americas
New York, NY 10036
Telephone: (917) 854-2310
Facsimile: (212) 336-2222

*Attorneys for Petitioner Darrin McGhee*

45