UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                :

DARRIN MCGHEE,                      :

                   Petitioner,      :      **ORDER AND OPINION**
                                  :      **DENYING § 2254 PETITION**
                                  :

        -against-                     :      22 Civ. 5801 (AKH)
                                  :

ANTHONY J. ANNUCCI et al.,       :

                                  :

                  Defendants.     :
------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        On the afternoon of November 14, 2011, Archie Phillips was shot and killed in

the parking garage of the housing complex that once was the Polo Grounds, the home of the

baseball and football Giants. Petitioner Darrin McGhee was found guilty of the murder, and was

sentenced to 25 years to life imprisonment. After exhausting state remedies, McGhee timely

filed a petition for a writ of habeas corpus in this court, pursuant to 28 U.S.C. § 2254. He raises

two principal grounds of constitutional violation: a *Brady* violation by the prosecutor, and a

corrupted identification by the main witness. Both lack merit; the petition is denied.

### THE TRIAL EVIDENCE

        At trial, the government sought to prove that McGhee was hired by two local

narcotics dealers, John Reynolds and his boss, Mike Lilly, to kill Archie Phillips. Reynolds

testified, under a cooperation agreement, that Lilly wanted Phillips killed as revenge for having

robbed Reynolds of his watch, money, and iPod. A. 1628.[1] Lilly considered McGhee to be a

---

[1] The Court cites to the record as provided at the bottom of each page of petitioner's exhibits.

"secret weapon," whom he did not want anyone "to get familiar with . . . just in case [they] had to use him." A. 1696–97.

Reynolds testified that, in the week leading up to the shooting, McGhee came to his apartment to "stake-out" and identify Phillips. Reynolds instructed his wife to allow Lilly into their apartment to give a gun to McGhee. A. 1675. Reynolds testified that he also gave McGhee a cell phone to coordinate identifications of Phillips's movements. On the afternoon of the shooting, Reynolds testified, he watched McGhee walking down the Polo Grounds stairs and through the parking lot, and heard gun shots but lost sight of McGhee. In support of this assertion, the government presented cell phone data to show that the phone number of the phone Reynolds had given McGhee showed a call received by Lilly just before Phillips was shot. Connie Truitt, Reynolds's wife, corroborated his account.

Reynolds testified that he and McGhee met in Lilly's apartment later that afternoon. He heard McGhee boast, "You should have seen how I put five in this n[***]a," and they smoked and celebrated. A. 1649. McGhee suggested they "get a coat hanger and scrape the barrel to get off the ballistics." A. 1650.

Reynolds testified that he had been in custody for his role in Phillips' murder, and hoped that his agreement to testify would result in a reduction of his sentence.

Nicole Davis, who had lived in the Polo Grounds for over a decade and was president of her building's tenants association, was a key eyewitness. She testified that she had been standing with three friends near the parking lot next to a staircase (commonly known as the "110 stairs") when she saw the shooting, just after 3:30 p.m. on November 14, 2011. A. 1030. She testified that she saw Archie Phillips leaning against a gate, hugging a woman whom she knew, forty to fifty feet away. A. 971–73, 987, 1030. One minute later, she saw McGhee shoot

Phillips "right in the back four times" and then "walk out in a slow pace . . . out of the parking lot going out the stairs." A. 973–75. She testified that the shooter was wearing "all beige" clothing, a jacket, and a "flat cap" with a "snap in the front." A. 973–75. Answering the question if she saw a gun, she first stated she was not close enough to see the gun, then that she did see the gun, and then that she "saw" the gun's "sound effects." A. 1042, 1048, 1053–54. Davis testified that she did not discuss the shooting with any of her three friends and did not share their names with law enforcement because she was nervous for herself, though she eventually informed the police that she was with three other people. A. 1020–21. She told the police about what she saw because "I knew I had to do something right, and I wanted somebody to do it for my own children . . . I had a feeling (sic) he could have did it to someone else if I didn't say anything." A. 992.

Davis testified that after McGhee shot Archie Phillips "he looked at me," and they made eye contact. A. 974–75. She testified that she recognized McGhee from two prior encounters: four months earlier as a "new face" in the Polo Grounds complex, A. 976–77, and the week before the shooting when they exchanged hellos while McGhee held the door for her as she exited the building. A. 977, 1016. The first time she saw him, she noticed he was "well built," and she and her friend talked about him. A. 976.

Davis testified that detectives came to her home later in the afternoon the day of the shooting, and she told them that the shooter "had all beige on." A. 1035. She testified that she was contacted that evening to come to the precinct, where she watched surveillance footage and identified the shooter from the footage. This was the first time she told law enforcement that she recognized the shooter. A. 1037–38. Davis identified McGhee again at the lineup in December 2011 and at trial. A. 1044

Officer Jorge Morban corroborated Davis's video identification. He testified that he was in the adjacent room when Davis was viewing the video and heard her exclaim, "That's him. That's him. He is the one that shot the boy." A. 1116.[2] Another officer was in the room with Davis but did not testify.

McGhee elected to testify. He testified that he was at the Polo Grounds to "me[e]t a young lady" who lived there. A. 1731–32. He confirmed that he was wearing beige clothing, and that it was he who was shown on the building's video surveillance. A. 1742–43. He testified that at the time of the shooting, "I got out of the cab and walked towards the curb. I heard bang, bang, bang, bang. I hid in between two cars because I don't want to get hit by stray bullets. So when the . . . bullets stopped firing, I see people running past me." A. 1742. He then ran up the stairs and away from the scene because "I'm [on] parole and I know that the police are going to be canvassing the area." A. 1743. He conceded that he possessed Reynold's phone, that he spoke to Lilly on that phone at a time that immediately preceded the shooting, that he met with Lilly at the top of the stairs immediately after the shooting, and that he visited Lilly later that night. A. 1743, 1766, 1783. He denied that he was in the parking garage when Davis claimed to have locked eyes with him. Despite all of these concessions, McGhee insisted that he did not have a relationship with Reynolds and that he did not shoot Archie Phillips.

The defense called two additional witnesses. Germania Rodriguez testified that she saw a man she believed to be the shooter in an elevator at the Polo Grounds, several months after McGhee had been taken into custody. A. 1854–59. However, she conceded that she did not see the actual shooting and could not get a good look at the face of the man she thought to be the shooter. A. 1860–67. Jessica Santiago, also a Polo Grounds resident, testified that she heard

---

[2] Defense counsel objected to the admission of Davis's statement as hearsay. The trial judge, after hearing Officer Morban's testimony outside the jury's presence, admitted Davis's exclamation as an excited utterance.

gunshots, saw one man drop to the floor, and saw another man "wearing all dark colored clothes . . . leap[] over two sets of fences." A. 1907.  However, she had memory issues due to a seizure condition and her recollection was not "completely clear." A. 1911, 1919.

## THE IDENTIFICATION ISSUE

Defense counsel moved before trial to suppress Davis's pre-trial identifications and objected again at trial.  At the pre-trial *Wade* hearing, defense counsel challenged the "whole identification procedure" as tainted by Morban's "all brown" suggestion.  A. 442; *see United States v. Wade*, 388 US. 218, 241 (1967).  At that hearing, Officer Morban testified that he had told Davis, prior to her first identification of McGhee from the surveillance footage, "if you see anyone matching the description of all brown just let us know." A. 435.  Morban first testified that the "all brown" description came from a 911 caller, and then that it came from Davis's description shared the night of the shooting.  A. 434–36.  He testified that Davis watched the video for around 15 minutes, and then identified a person wearing all brown who appeared on the screen as the shooter.

The court denied Defendant's motion to suppress on the ground that "[t]here was absolutely no suggestion that [Davis] should pick out" McGhee on the video, or at the subsequent line-ups, citing *People v. Edmonson*, 75 N.Y.2d 672 (1990).  A. 447.  The court found that the photographs shown to Davis "all look similar" and the people in the lineup "were wearing similar color, clothes and a hat" and, like McGhee, "have some facial hair." A. 447–48.  The trial court judge also overruled defense counsel's objections at trial and permitted the identifications' introduction through Davis's testimony.  *See* A.1003–06.

## THE *BRADY* ISSUE

On January 4, 2016, fourteen months after McGhee was arrested, and eight months after he was convicted, the ADA who had prosecuted McGhee disclosed a police investigator's interview notes of a statement by "Individual-A," given during an interview with the ADA on February 1, 2013.  The investigator's note stated:

> On this day [Individual-A] was sitting 155th st by the train station with [redacted] and [redacted] both who are originally from the Polo Grounds. When he's hanging out, he's very observant of his surrounding area. During this time he observes a m/b wearing a beige bucket hat, darker beige shirt and khakis walking down the 110 steps. The m/b walks through the 3rd lane of the parking lot to the F/O building #3 and engages in a conversation, with a m/b (later known as Archie Phillips). At this time, he hears 1 gun shot and sees Archie being chased by the m/b (dressed in beige) running towards building #2. He loses sight of them, when they run behind the benches and then sees them again. Once he sees them again, he hears 3 more shots and sees the perp, run back towards the 110 stairs by cutting through the 1st lane of the parking lot and run's [sic] up the 110 stairs.
> The word on the street is that Archie "robs" people after they cash their [Social Security] check. The killer is the son of one of his robbery victims.
> ADA Hammer, ADA Gilbert and ADA Krupnick did interview the ====== in regards to the above statement.
> Det. Morban of the 32sqd was notified of the above statement.
> All perps in this case have been arrested and have a court appearance in part 71 on 3/04/13

After the disclosure, McGhee's counsel, the ADA, and Individual-A met. Individual-A stated that he no longer could recall the events or his statement to the investigator and did not want to participate in any further proceedings.

## POST-CONVICTION PROCEDURE

In September 2017, McGhee's appellate counsel collaterally challenged his conviction under NY CPL 440.10.  McGhee argued that the prosecution's failure to disclose Individual-A's statements until eight months after trial violated his Due Process rights under

6

*Brady v. Maryland*, 373 U.S. 83 (1963). McGhee had previously directly appealed his conviction, which including an appeal of the trial court's evidentiary rulings.

The trial court denied the 440.10 motion on the ground of lack of materiality. The court held that the *Brady* material, although "impeaching in nature with regards to Nicole Davis's testimony," was not exculpatory, as the "description of the perpetrator matched the description of the defendant." A. 160. McGhee argued that the interview could suggest an alternative suspect, but the suggestion was nothing more than "word on the street," without "firsthand information regarding an alternative perpetrator," and was inadmissible hearsay. A. 160.

McGhee appealed to the Appellate Division, which consolidated the 440.10 appeal with the direct appeal of conviction. The Appellate Division held that the non-disclosure of Individual-A's statement was material because of differences between the Davis and Individual-A's descriptions and the potential alternative suspect lead, creating a *Brady* violation. Second, it held that the trial court should have suppressed Davis's pre-trial identifications and abused its discretion by admitting the pre-trial statement as an excited utterance. The Appellate Division ruled that although each "may" have been harmless error, taken together, "it cannot be said in light of those errors that the goal of a fair trial was achieved." *People v. McGhee*, 116 N.Y.S.3d 206, 208 (N.Y. App. Div. 2019). One justice dissented as to the *Brady* determination, stating that, based on the whole trial record, disclosure would not have reasonably led to a different verdict.

In a two-page opinion, the NY Court of Appeals reversed the Appellate Division, holding, based on the record as a whole, that there was "no reasonable possibility that the People's failure to disclose the witness statement at issue undermined the fairness of

[petitioner's] trial or impacted the verdict." *McGhee*, 166 N.E.3d 1041, 1043 (N.Y. 2021). It held that Individual-A's statement had little impeachment value because his "description of the shooter and his flight path did not differ in any material respect" from Davis's testimony, and because McGhee's guilt was supported by significant independent evidence. *Id.* The court also held that the undisclosed evidence would not have supported an alternative theory of defense nor led to additional admissible evidence. *Id.*

The Court of Appeals remanded the evidentiary issues in the appeal to the Appellate Division, which then affirmed the judgment of conviction. The Appellate Division held that although Davis's video identification was subject to suggestive conduct by law enforcement, the identification was harmless error "in light of the overwhelming evidence of guilt." *People v. McGhee*, 146 N.Y.S.3d 635, 637 (N.Y. App. Div. 2021). The Appellate Division credited the "reliable lineup and in-court identifications of defendant as the gunman," the cooperating witness's testimony "about how defendant committed this murder for hire and boasted about it" and the confirming evidence from cell phone and video records. *Id.* It held that the trial court properly denied suppression of Davis's lineup identification, the six weeks that had elapsed between the two identifications removed any taint of impropriety, and that the detective's mentioning of all brown, without mentioning any further details about the gunman's likeness, was insignificant.

Leave to appeal the Appellate Court's decision was denied. McGhee filed this timely petition under 28 U.S.C. § 2254 seeking relief from his state court conviction.

## AEDPA'S STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d)(1), a federal district court may not grant a habeas petition unless the state

court's decision was "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."[3]

A decision is "contrary to" clearly established federal law if the state court "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A decision constitutes an "unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

The standards for § 2254(d) determinations are "highly deferential" and demand "state-court decisions be given the benefit of the doubt." *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). A state court decision is reviewed "only for the reasonableness of its bottom-line result, not the quality of its reasoning." *McCray v. Capra*, 45 F.4th 634, 640 (2d Cir. 2022) (quotations omitted). State court factual findings must be presumed correct, rebuttable only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e). Relief is warranted only "where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

In evaluating these claims on habeas review, this Court reviews the "last reasoned decision" by the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991). The last reasoned decision on the *Brady* claim is from the Court of Appeals, *People v. McGhee*, 166 N.E.3d 1041

---

[3] Relief is available under 28 U.S.C. § 2254(d)(2) if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." McGhee does not raise § 2254(d)(2) in his brief, waiving review on that ground. *See Woodford*, 537 U.S. 19, 25 (2002). In any event, I cannot say that the state court determinations were unreasonable.

(N.Y. 2021), and the last reasoned decision on the claims relating to the evidence identifying McGhee as the killer is from the Appellate Division, *People v. McGhee*, 146 N.Y.S.3d 635 (N.Y. App. Div. 2021).

## DISCUSSION

### I.    *Brady* violation

#### A.    **Applicable Law**

The government's affirmative duty under the Due Process Clause to disclose evidence favorable to the accused is well-established. *Brady*, 373 U.S. at 87; *Giglo v. United States*, 405 U.S. 150, 154 (1972). *Brady* violations contain three components: 1) the evidence at issue must be favorable to the accused, whether it be exculpatory or impeaching, 2) that evidence must have been suppressed by the state, either willfully or inadvertently, and 3) prejudice resulted, or the failure to disclose was "material." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *United States v. Hunter*, 32 F.4th 22, 31 (2d Cir. 2022).

The issue on this motion focuses on the third component, materiality. Pet'r Mem. at 25; Pet'r Reply Mem. 14 at 30–31.[4]  "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469–70 (2009). [5]  Whether the result of the proceedings would have been different, in turn, is measured by whether the suppressed evidence, considering the trial record as a whole, "undermines confidence in the

---

[4] The prosecution's failure to disclose Individual-A's statement is not understandable.  At argument, the Assistant District Attorney justified his colleague's failure, which he called a "bureaucratic lapse," by arguing that the statement was not favorable to the accused.  But that should have been decided by defense counsel, not the prosecutor.  The prosecutor's failure was not material, but nevertheless is inexcusable.

[5] The New York standard of review, "reasonable possibility," is a more defendant-friendly standard.  See *Cone v. Bell*, 556 U.S. 449, 469–70 (2009); *Johnson v. Williams*, 568 U.S. 289, 301 (2013).

outcome of the trial." *Turner v. United States*, 582 U.S. 313, 325 (2017). If there is a reasonable probability "even one juror would have voted to acquit" if the information had been disclosed, the trial cannot be said to have been fair. *Hunter*, 32 F.4th at 31.

Because the Court of Appeals reached the merits on the materiality determination, that decision is subject to the § 2254(d) standards of review as a question of law. *See Cone*, 446 U.S. at 471; *Hunter*, 32 F.4th at 31. Even so, because the *Brady* rule is "relatively general," courts conducting a § 2254 review should provide state courts with "more leeway . . . in reaching outcomes in case-by-case determinations." *McCray*, 45 F.4th at 641 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## B.   Petitioner's Argument

McGhee's materiality argument hinges on three propositions: first, that the information could have impeached the government's eyewitness, Nicole Davis; second, that the report could have led to exploring alternative suspects, the sons of the victims of Archie Phillip's social security thefts; and third, the report could have impeached law enforcement's investigation for its failure to pursue potential alternative suspects.

## C.   Application

The Court of Appeals holding, that there was "no reasonable possibility that the People's failure to disclose the witness statement at issue undermined the fairness of [petitioner's] trial or impacted the verdict," *McGhee*, 166 N.E.3d at 1043, is neither "contrary to nor an unreasonable application of clearly established federal law." 28 U.S.C. § 2254(d)(1).

In coming to its decision, the Court considered the entire record. *Turner*, 582 U.S. at 324–35. Individual-A's statement was consistent with Davis's testimony, except in the descriptions of the shooter's hat (a "flat brim hat" versus a "bucket hat"), the interaction between the shooter and victim (a face-to-face conversation versus an ambush from behind) and how the

11

shooter left the scene (walking "at a slow pace" versus running up the stairs).  Petitioner also emphasizes differences in these two accounts match up with the autopsy data (showing one shot from the front, one from the side, and two from the back)

Furthermore, the Court ruled that there was sufficient independent evidence of guilt presented at trial to support a finding that nondisclosure was overall immaterial to the trial's outcome. *See United States v. Gil*, 297 F.3d 93, 103 (2d Cir. 2002) ("Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin.").  The Court of Appeals appropriately credited the plentiful independent evidence, including surveillance footage, phone records, and additional witnesses corroborating Nicole Davis's account.  McGhee's arguments are insufficient to overturn a state court decision that coheres with federal precedent on the issue.  The Court of Appeals holding of immateriality reasonably applied *Brady*.

McGhee argues that Individual-A's statement provided tools for impeachment, and impeachment evidence is more likely to be material under *Brady* when the star witness has not been impeached by other means. Pet'r Mem. at 26–27 (*citing United States v. Orena*, 145 F.3d 551, 559 (2d Cir. 1998); *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995).  The argument lacks merit.  The jurors had the opportunity to weigh McGhee's credibility relative to Davis.  Other defense witnesses gave accounts of the shooting that varied in multiple ways from that of Nicole Davis.  Germania Rodriguez claimed she saw the shooter in the building while McGhee was already in state custody, and Jessica Santiago testified that she saw the person who she believed to be the shooter jump over two fences immediately after the shooting, not run up the stairs.  The minor differences between Individual-A's statement and Nicole Davis's statement could not have added significantly to the mix of evidence supporting the jury's

credibility determinations.  This was not a binary case of one star witness's account versus the defendant's account.  *Compare Wearry v. Cain*, 577 U.S. 385, 392–93 (2016) (finding prejudice where conviction was "built on the jury credibility [the star witness's] account rather than [the defendant's]"), *with Orena*, 145 F.3d at 559 ("where ample ammunition exists to attack a witness's credibility, evidence that would provide an additional basis for doing so is ordinarily deemed cumulative and hence immaterial").

Finally, mere speculation about the effects of undisclosed evidence does not provide a basis for materiality.  *See Wood v. Bartholomew*, 516 U.S. 1, 7–8 (1995); *see also United States v. Santos*, 486 F. Appx. 133, 135 (2d Cir. 2012) (undisclosed and inadmissible hearsay does not create materiality).  Individual-A declined to cooperate following his interview and claimed not to have recollection.  *See Bartholomew*, 416 U.S. at 6.  The statement itself as to a possible alternative suspect was "word on the street," and inadmissible hearsay.  Nor was the information in the statement so distinct from the evidence at trial as to challenge the integrity of the trial.

## II.   Challenges to evidentiary rulings on identification evidence

McGhee makes three arguments relating to rulings of admissibility, all involving Nicole Davis's identification of McGhee as the person who shot and killed Archie Phillips. None has merit; none shows an unreasonable application of clearly established federal law.

For an evidentiary ruling to be reviewable at the federal habeas stage, the claim must be not just an error of a state's rules of evidence.  *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006).  An erroneous state evidentiary ruling qualifies as a constitutional violation only where a "petitioner can show that the error deprived [him] of a fundamentally fair trial."  *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988).  A petitioner must establish that the erroneously admitted evidence was "crucial, critical, and highly significant."  *McKinnon v. Superintendent*,

13

*Great Meadow Corr. Facility*, 422 F. Appx. 69, 73 (2d Cir. 2011) (*quoting Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985)).

      A state court's determination that an evidentiary ruling constituted harmless error is subject to two separate federal habeas-specific inquiries, which must both be met for relief to be granted. *See Krivoi v. Chappius*, No. 21-2934, 2022 WL 17481816, at *3 (2d Cir. Dec. 7, 2022). First, a habeas petitioner must show that an error had a "substantial and injurious" effect or influence on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 622–23 (1993). Second, a petitioner must show that the state court's harmless error determination was an unreasonable application of federal law under § 2254(d)(1). *Brown v. Davenport*, 596 U.S. 118, 134 (2022). A state court's determination is not unreasonable if "fairminded jurists could disagree on its correctness." *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (quotations omitted).

      McGhee's claims regarding the trial court's evidentiary rulings center on three rulings: two rulings that Davis's pre-trial identifications – via video footage the night of the shooting and via line-up six weeks later – were not improperly suggestive, and that Davis's exclamation identifying McGhee as the shooter was admissible. The Appellate Division determined that the trial court's failure to suppress Davis's video identification was harmless error, that the trial court properly denied suppression of Davis's lineup identification, and that the trial court's admission of a detective's testimony regarding Davis's video identification as an excited utterance was harmless error. McGhee's arguments lack merit.

### A. Video Identification Ruling

      McGhee challenges Davis's identification of him as the shooter based on what he alleges to be an impermissibly suggestive identification procedure, because Officer Morban testified that he told Davis to look for someone wearing "all brown" prior to watching the

surveillance tape the night of the shooting. The Appellate Division held that although Davis's video identification was subject to suggestive conduct by law enforcement, its admission was harmless error "in light of the overwhelming evidence of guilt." *McGhee*, 146 N.Y.S.3d at 637.

McGhee's argument to this Court is that the trial court erred in admitting Davis's identifications. *See* Pet'r Mem. at 41. But it is the Appellate Division's ruling that the error was harmless that is to be evaluated, and that determination was not an unreasonable application of federal law. The Appellate Division held that there was "overwhelming evidence of defendant's guilt." *McGhee*, 146 N.Y.S.3d at 637; *see People v. Crimmins*, 326 N.E.2d 787 (1975) (the New York state constitutional equivalent to *Chapman v. California*, 386 U.S. 18 (1967)). The Appellate Division supported its determination with the "reliable lineup and in-court identifications of defendant as the gunman," the cooperating witness's testimony "about how defendant committed this murder for hire and boasted about it" and the cell and video records presented at trial. *McGhee*, 146 N.Y.S.3d at 637. The Appellate Division's determination is not an unreasonable application of clearly established federal law.

## B. Line-up identification ruling

McGhee challenges the Appellate Division's determination that Davis's line-up identification was admissible because her video identification was tainted by the impermissibly suggestive video identification. McGhee argues that "there is no reason to believe that Davis would have *ever* identified McGhee . . . had the police not directed her towards him in the first instance." Pet'r Mem. at 38.

However, Davis had prior interactions with McGhee. She testified that she recognized McGhee at the shooting when they locked eyes because of two prior encounters between them – four months before the shooting and the week of the shooting. The Appellate

15

Division reasonably recognized that "the eyewitness told the detective she recognized defendant in the lineup as the one who shot the victim," not as the person she had seen in prior identification proceedings. *McGhee*, 146 N.Y.S.3d at 637.

The Appellate Division reasonably applied Supreme Court precedent. *See Stovall v. Denno*, 388 U.S. 293 (1967); *Simmons v. United States*, 390 U.S. 377 (1968). The Appellate Division first considered if the initial procedure of the video identification was unduly suggestive. *McGhee*, 146 N.Y.S.3d at 637. It then considered if the identification "impermissibly singling out defendant" required suppression of the subsequent line-up identification. *Id.* The Appellate Division was persuaded that the passage of six weeks between the two identifications and the absence of details other than the color of the gunman's clothing removed any argument of taint from Nicole Davis's identifications. *Id.* These rulings, supporting no fundamental fairness violation, were reasonable and in line with clearly established precedent.

### C. Excited Utterance Ruling

McGhee argues that the trial court should not have admitted Davis's excited utterance, "That's him. He is the one that shot the boy." Pet'r Mem. at 41–43. Officer Morban's testimony of Davis's excited utterance was not the only ground by which the jury learned about Davis's identification of McGhee as the shooter. It can hardly be said that Morban's testimony was "crucial" or "critical," when the jury had learned about this identification from Davis herself earlier in the trial. McGhee's evidentiary claim does not have a constitutional dimension.

### III.   Cumulative Effect

McGhee argues for the first time that the cumulative effect of the errors claimed above entitle him to federal habeas relief. However, that claim is procedurally barred because it

was not brought in prior state proceedings. *See Jimenez v. Walker*, 458 F.3d 130, 148–49 (2d Cir. 2006).

Even if the claim is considered, it lacks merit.  The alleged errors, whether considered individually or collectively, are outweighed by the overwhelming evidence of McGhee's guilt.  *See United States v. Hurtado*, 47 F.3d 577, 586 (2d Cir. 1995).  McGhee's own testimony, the other trial witnesses' testimonies, and the cell phone and surveillance footage convincingly prove McGhee's guilt and were unchallenged in his petition.  I deny § 2254 relief.

## CONCLUSION

For the foregoing reasons, the petition for relief pursuant to § 2254 is denied and the action is dismissed.  Although, in my opinion, Petitioner McGhee has failed to make a substantial showing of the denial of a constitutional right, the differences of opinion among the judges' rulings in this case, and the violation the first two *Brady* prongs, warrant the issuance of a certificate of appealability.  28 U.S.C. § 2253(c)(2).  The Clerk is instructed to terminate the open motion at ECF No. 3 and enter judgment dismissing the case.

SO ORDERED.

Dated:      January 3, 2024
            New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

17